21-02146 RECEIVED

SECT.AMAG. 5

NOV 16 2021

Legal Programs Department

SCANNED at LSP and Emailed
11-16-21 by VB , 61 pages
date    initials  No.

No._____

## IN THE
## EASTERN DISTRICT OF THE UNITED STATES

### LARRY BICKHAM

*Petitioner*

### VERSUS

### DARREL VANNOY, WARDEN
### LOUISIANA STATE PENITENTIARY

*Respondent*

## MEMORANDUM OF FACT AND LAW IN SUPPORT OF HABEAS CORPUS RELIEF

Respectfully Submitted;

*Larry Bickham*

Larry Bickham #194310 (Pro se)
Main Prison/Hickory-4
Louisiana State Penitentiary
17544 Tunica Trace
Angola, Louisiana 70712

TENDERED FOR FILING

NOV 1 6 2021

U.S. DISTRICT COURT
Eastern District of Louisiana
Deputy Clerk

# PREFACE

1.    Asserting his conviction was obtained contrary to state and federal law and derivations of protections thereto, petitioner believes this unique case and his presentation thereof should easily pass scrutiny of the magistrate judge, warranting a full review and resulting in reversal of conviction without harmless error review (on Count-1 alone).

2.    Where it was impossible to present the magnitude of the violations in this case within the form itself, out of respect to the Court and to avoid redundancy herein, petitioner will do his best to present the main facts only as necessary to present the claims-allowing the Court to assess the details of the record and by attaching exhibits hereto.

3.    Further, petitioner request this Honorable Court to take note and consideration of the fact that in petitioner's denied Louisiana Supreme Court certiorari that one justice-in a short dissent-like comment-stated that he "would have granted in part," (which "part" the petitioner asserts related directly to Count-1 of the case and its illegality.)

4.    Finally, the Court will-by the end of Claim-2 — see that this unique case also had what the trial judge saw as a developing "trial within a trial"; i.e., the judge noting the obvious corruption in the case by state's key witnesses (including the plot of a state key witness and a detective to assist said key witness in deceptively obtaining custody of petitioner's minor child (the child at issue in the case) — which, the petitioner asserts as the impetus for the erroneous case developed against him and which evidence the trial judge suppressed.

# TABLE OF CONTENTS

Page

MEMORANDUM OF FACT AND LAW IN SUPPORT OF HABEAS CORPUS RELIEF...........
TABLE OF AUTHORITIES.........................................................................................iii
PREFACE.........................................................................................................1
Global Standards of Review.................................................................................1
CLAIM-1.........................................................................................................2
(As related to Count-1)........................................................................................2
Standards of Review...........................................................................................2
Arguments.......................................................................................................4
(Claim-1).........................................................................................................4
CONCLUSION..................................................................................................10
(Claim-1).........................................................................................................10
RELIEF SOUGHT..............................................................................................11
(Count-1).........................................................................................................11
CLAIM-2.........................................................................................................11
(Count-2).........................................................................................................11
Preface...........................................................................................................11
Standards of Review..........................................................................................11
(Claim-2).........................................................................................................11
ARGUMENTS...................................................................................................13
PREFACE.........................................................................................................13
Count-2/A Historical Investigation.........................................................................13
Corruption of Witnesses and Flash-Drive Evidence Suppression......................................15
Trial Judge's Improper Suppression of the Flash-Drive..................................................18
Other Improper Suppressions................................................................................21
CONCLUSION..................................................................................................25
(Claim-2).........................................................................................................25
Relief Sought...................................................................................................26
(Count-2).........................................................................................................26
Reversal of Conviction........................................................................................26
Claim-3...........................................................................................................26
Standards of Review..........................................................................................26
Arguments.......................................................................................................27
State Witness Kelvin Rushing.................................................................................27
State's Witness/Ashley Mason...............................................................................31
State's Witness/Kayla Gregg.................................................................................31
State's Witness/Marshae Navarre...........................................................................33
CONCLUSION..................................................................................................33
(Claim-3).........................................................................................................33
Relief Sought...................................................................................................34
(Claim-3).........................................................................................................34
Reversal of Conviction........................................................................................34

Claim Four.................................................................................................................34
CONCLUSION............................................................................................................36
(Claim Four)...............................................................................................................36
Relief Sought..............................................................................................................36
(Claim Four)...............................................................................................................36
Reversal of Conviction...............................................................................................36
Claim Five..................................................................................................................36
Standard of Review.....................................................................................................37
Arguments...................................................................................................................37
CONCLUSION............................................................................................................41
Relief Sought..............................................................................................................42
Reversal of Conviction...............................................................................................42
CERTIFICATE OF SERVICE.....................................................................................43

# TABLE OF AUTHORITIES

Page(s)

*Cases:*

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)................................12
Dent v. West Virginia, 129 U.S. 114, 113 S.Ct. 231, 233.................................................1
Jackson v. Virginia, 443, U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979)...................................3
Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, at HN-1 (U.S. (La) 1995)..............................12
Martin v. Hunter, 1 Wheat, 304, 4 L.Ed.2d 5..........................................................1
Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 341-342 (1935)...................................12
Moore v. Illinois, 408 U.S. 786, 794-795, 92 S.Ct. 2562, 2567-2568, 33 L.Ed.2d 706 (1972).....12
Morrisey v. Brewer, 408 U.S. 481, 92 S.Ct. at 2600..................................................1, 4
Napue v. People, 360 U.S.264, 79 S.Ct. 1173, at 1178 (U.S. (Ill.) (1959)..............................1
Pella v. Adams, 702 F. Supp. 244, 246................................................................3
Pyle v. State of Kansas, 317 U.S. 213, 215-216, 63 S.Ct. 177, 178-179, 87 L.Ed. 214 (1942).....12
State v. Burbank, 893 So.2d 109 2001-0831 (La. App. 4th Cir. 2004)...................................26
State v. Goodley, 820 So.2d 478 2001-0077 (La. 6/21/02)...............................................2
State v. Interest of A.#., 206 So.2d 1081, 51,053 (La App. 2nd Cir. 9/28/16)...........................12
State v. Neal, 796 So.2d at 657. 657.................................................................4
State v. Patorno, 822 So.2d 416, 420, 2002-1492 (La. App. 1st Cir. 2/14/03)............................4
State v. Vaccaro, 411 So.2d 415 (1982)..............................................................23
State v. Vale, 666 So.2d 1070 at 1071 (La.1996).....................................................26
Tassin v. Cain, 517 F.3d 770........................................................................27
U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 763, 766, 31 Ed.2d 104 (1972)................................26
Wolff v. McDonell, 418 U.S. 539, 94 S.Ct.2963.......................................................1

*Constitutional Provisions:*

U.S.C.A. Const. Amend. 14, § 1.......................................................................1
U.S.C.A. Const. Amends. 5, 14.......................................................................13
U.S.C.A. Const. Amend. 6............................................................................26

LSA—Const. Art. 1, § 2...............................................................................1
LSA—Const. Art. 1, § 16.............................................................................26

*Statutes & Procedures:*

LSA-R.S. 15:438................................................................................3, 4, 11, 12
LSA-R.S. 15:492....................................................................................26
LSA-R.S. 23:1081(7)(e)...........................................................................3, 4, 9
LSA-La. C. Cr. P. art. 802.........................................................................2, 4
LSA-La. C. Cr. P. art. 821......................................................................3, 4, 11
LSA-La. C. Cr. P. art. 802...........................................................................5
LSA-La. C. Cr. P. art. 729.3........................................................................23

## Global Standards of Review
### (Applying to all claims herein)

A.      When a structural error is "present, such an error is not subject to harmless error review;

B.      The touchstone of due process is the protection of the individual against the arbitrary action of government; *Wolff v. McDonell*, 418 U.S. 539, 94 S.Ct.2963; *Dent v. West Virginia*, 129 U.S. 114, 113 S.Ct. 231, 233.

C.      Consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as the private interest that has been affected by the government action; *Morrissey v. Brewer*, 408 U.S. 481, 92 S.Ct. at 2600; U.S.C.A. Const. Amend. 14, § 1; LSA—Const. Art. 1, § 2.

D.      No state shall. . .deny to any person within its jurisdiction the equal protection of the laws; U.S.C.A. Const. Amend. 14, § 1.

E.      The duty of this Court to make its own independent examination of the record when federal constitutional deprivations are alleged is clear, resting, as it does, on our solemn responsibility for maintaining the constitution inviolate; *Martin v. Hunter*, 1 Wheat, 304, 4 L.Ed.2d 5 (as cited from—*Napue v. People*, 360 U.S.264, 79 S.Ct. 1173, at 1178 (U.S. (Ill.) (1959).

F.      In cases in which there is a claim of denial of rights under the federal constitution, this Court is not bound by the conclusions of Lower Courts, but will re-examine the evidentiary basis on which those conclusions are founded; *Napue, supra,* at 1178.

**1**

## CLAIM-1
### (As related to Count-1)

Petitioner is Unconstitutionally Confined to Natural Life in Prison (Life Without Possibility of Parole) Upon an Invalid, Uninformed Verdict being Rendered by Prejudicially Inflamed Jury Due to Nature of Count-1 Allegation—The Guilty Verdict Resting Upon an Unconfirmed "Presumptive Positive" Non-Quantitative Drug Screen which Jurors were Deprived Knowledge of Legal Requirement of a Confirmation Test to use as Basis to Sanction; A Structural Error Infecting the Entire Trial and Depriving Petitioner of His Federal Constitutional (and State Constitutional) Rights to Due Process and the Equal Protection of the Laws—an Error Mandating Reversal Without Harmless Error Review.

### Standards of Review

A.      Petitioner incorporates into Claim-1 his Global Standards of Review; (A-F)

B.      As a general matter, at trial judge has the duty to instruct the jury as to every phase of the case. . .and that duty extends to any theory which a jury could reasonably infer from the evidence; *State v. Goodley*, 820 So.2d 478 2001-0077 (La. 6/21/02); LSA-La. C. Cr. P. art. 802 (underlined emphasis added).

C.      Inference:  In the law of evidence; a truth or propositions drawn from another which is supposed or admitted to be true, a process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a set of facts, already proven or admitted; Black's Law Dictionary, 4th Edition.

D.      Deduce:  (1) to receive or obtain from a source; to obtain from a parent source; (3) to infer, deduce; (4) To trace the derivation of; (5) to come from a certain source; Webster's Dictionary (underlined emphasis added).

2

E.     LSA-R.S. 23:1081(7)(e) ". . .sample shall conform to scientifically accepted analytical methods and procedures.  Testing shall included verification or confirmation of any positive test by Gas Chromotagraphy—Mass Spectrometry ("GCMS") or other comparably reliable analytical method before the test may be used as a basis . . ."(underlined emphasis added) (parenthetical acronym added for clarity).

F.     Consequently, when accuracy is a paramount concern, the GLC-MS test (another acronym for "GCMS") should be used in conjunction with the Emit test ( a non-quantitative drug screen subject to false positives; not comparable to the "GCMS"); *Pella v. Adams*, 702 F. Supp. 244, 246 (deposition of expert Dr. Ritzlen at 16: 7-22 and 24; 212 in Pella's case) (underlined emphasis added, parenthetical text added for contextual clarity).

G.     Presumptive:  of fact; an inference affirmative or disaffirmative of the truth or falsehood of any proposition of fact drawn by a process of probably reasoning in the absence of certainty of its truth or falsehood, or until such certainty can be ascertained; Black's Law Dictionary, 4th Edition.

H.     LSA-La. C. Cr. P. art. 821 requires that a conviction be based upon proof sufficient for any rational trier of fact (and law—as relevant in the instant case) . . .to find that the essential elements of the crime had been proven beyond a reasonable doubt; *Jackson v. Virginia*, 443, U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979) (underlined emphasis added)

I.     When applying circumstantial evidence, LSA-R.S. 15:438 provides that the

3

*Jackson* standard or review, incorporated into art. 821, is an objective standard for testing the <u>overall evidence</u> both direct and circumstantial, for reasonable doubt; when analyzing circumstantial evidence, 15:438 provides that the fact finder must be satisfied the overall evidence <u>excludes every</u> reasonable hypothesis of innocence; ***State v. Patorno***, 822 So.2d 416, 420, 2002-1492 (La. App. 1ˢᵗ Cir. 2/14/03); see also—***State v. Neal***, 796 So.2d at 657. 657

## <u>Arguments</u>
### (Claim-1)

1.  As to <u>Count-1</u>, the precise nature of the trial court function (under <u>Morrisey</u>, *supra*, at 92 S.Ct. at 2600) was the <u>admitted duty</u> of the trial judge to instruct the jury (per <u>Goodley</u> and LSA-La. C. Cr. P. art. 802, *supra*) as to the relevant law and legal requirements—being that a presumptive positive drug test must be confirmed by a GCMS (or comparable method) in order to be used "as a basis' (per LSA-R.S. 23:1081(7)(e) to sanction (or otherwise punish) — in the instant case, the judge failed at that duty (as follows).

2.  Factually:

    A.  The trial record, at P. 410, shows that the trial judge had a familiarity dealing with cases in his courtroom involving drug screens and drug test confirmation; a judge admission to that <u>fact.</u>

    B.  The trial record also shows that the trial judge stated to the jury that it was <u>his duty</u> to inform the jury as to the relevant law, so the jurors could <u>apply</u> that law —

4

because the jurors were the sole judge's of fact and law; Trial Rec. pp. 682, 1726.

     C.    That failure to instruct on relevant drug testing law and requirements violated the premises of Goodley and LSA-La. C. Cr. P. art. 802, supra — constituting a structural error (and error patent) which not only deprived petitioner of his state and federal constitutional rights to due process but which also

     (i)    Deprived the jury of making an informed and legally valid verdict; and,

     (ii)    Allowed the jury to make an irrational finding most certainly aggravated by the nature of the crime of Count-1 alleged; making the jury prejudicial and hostile.

3.    As a result of this judge error, being structural and affecting the trial as a whole, the jury made a finding of guilty as to Count-1 which was contrary to law; when, had the judge done his stated duty and informed the jury of the relevant law requiring a drug test confirmation in order for a finding/"Basis" of guilt, the jury, as a matter of law would have been required to acquit petitioner as to Count-1 (or otherwise render not guilty); further, the allowance of such invalid, illegal verdict also most certainly contributed to the related Count-2 crime allegation.

4.    Review, under Napue and Martin, supra, will also reveal from the record the following incontrovertible facts which render every fact of circumstance in favor of petitioner for acquittal/not guilty verdict of Count-1 and therein solidly establishing a very strong reasonable hypothesis of innocence — for, per law, without proof in such unique case, guilt cannot possibly be established (and the legal requirements invalidate and moot

inference):

A.      The drug screen at issue was file marked as "Presumptive Positive". . ."in the interest of accuracy"; trial Rec. P. 790-791

B.      That no drug test confirmation test was conducted: Trial Rec. Pp. 780, 1544

C.      And that drug test confirmations should be conducted; Trial Rec. Pp. 809, 1544, 1584

D.      There are some. . .tests that do indeed have some cross-reactivity with specific other typically non illegal substances Trial Rec. P. 790-91.

*       The court will also note that Pella, *supra*, at 246 makes explicitly clear that lesser due process standards that may apply to prison-related scenarios (i.e., Disciplinary matters in prisons) is not comparable to a criminal conviction.

5.      Collectively, thus far, we see:

A.      The judge failed to instruct the jury as to the relevant drug testing law/requirements, and that the judge is without excuse having familiarity with such matters.

B.      The error is structural whereas the jury made an uninformed verdict contrary to law.

C.      Finally, due to the nature of Count-1 allegation, any reasonable person allowed to believe guilt (without proof) would naturally be inflamed and therefore hostile and prejudicial; which would infect the entire trial.

6

6.     Notwithstanding, this structural error not subject to harmless error review (McCoy, supra, at 1511), even the historical and circumstantial + facts   · are in favor of the petitioner's reasonable hypothesis of innocence; to wit:

A.     Historically, State's key witness Lisa Gautier brought the minor child at issue to the emergency room-alleging fever and seizure activity; Trial Rec. Pp. 782, 1533, 1536 (Noting the child's mother, witness Kayla Gregg, met Gautier at said emergency room).

B.     However, the doctor testified there was no evidence of seizure (Trial Rec. Pp. 782, 533); also corroborated by fact an MRI was conducted on the child (Trial Rec. Pp. 85, 851) also showing neither sign of seizure or other neurological impairment.   (The Court will note here, also, one of the elements to be proven as to (Count-2 is serious damage or impairment resulting from the conduct).

C.     The child required no treatment but was merely observed a short time (trial Rec. Pp. 872, 1533) — as a precaution to Gautier's allegation of seizure

D.     And the child required no medications; Trial Rec. p. 800.

E.     That in said observation of the child, the child-instead-appeared, healthy, responsive, and eating; Trial Rec. Pp. 880,810, 576, 1568.

F.     And that the child was soon released without need of any follow-up appointment; Trial Rec. Pp. 1570-1571.

G.     As to the child's fever; same was recorded as only 98.8; Trial Rec. p. 1536; to which the following facts may be added:

7

(i)     At trial, Gautier adamantly ("100%") denied (falsely) that she ever gave the child any adult over-the-counter medications; Trial Rec. p. 1006;

(ii)    But in contrast to Gautier's false testimony:

(a)     Gautier's daughter, Marilyn Tapia, testified that, indeed, Gautier did give the child adult Tylenol; Trial record Pp. 1154-1155; and,

(b)     The child's mother, Kayla Gregg, also contradicted Gautier's false statement, stating that Gautier also gave the child adult Dime Tapp; Trial Rec. Pp. 1233-1234

(iii)   Thus, it is reasonable to believe (unless you are a juror convinced erroneously by the prosecutor that a non-confirmed drug test is sufficient for guilt):

(a)     The child's slight fever could have been  a result of a slight cold or from Gautier's irresponsible act of combining adult medications administered to the child—which might result in a false positive drug screen.

(b)     It is entirely possible that Gautier committed the act of combining and administering adult medications to the child to purposefully cause a false positive test (in her plot to deprive petitioner and taking custody of his daughter).

*The plot of Gautier to obtain custody of are child will appear at the end of the claims herein; but the Court may note for now the suspicious fact that Kayla Gregg testified that "Lisa [Gauthier] proceeded to suggest [to hospital staff] that I get a full examination done including to get a drug test "; Trial Rec. p. 1219 (See also p. 713) and "I did recommend that" Ibid. (Bracketed text added for contextual clarity) (underlined emphasis added).

8

7.    Thus, there is no direct or circumstantial evidence supporting petitioner committed the alleged crime of Count-1; the only thing done wrong in all of the above facts was the irresponsible act of state's key witness Lisa Gautier giving the child the combination of adult medications.

8.    The above more than certainly constitutes this Court conducting a full and fair review in this matter, per Martin and Napue, supra.

9.    And, in light of all of the above in-controvertible facts, the assertion becomes

If the reality of LSA-R.S. 23:1081(7)(e) prohibits the sanction or punishment of loss of job or loss of worker's compensation without a drug test confirmation . . .how much more, then, should a man be prohibited from suffering the grievous loss of liberty for his natural life without the same legal protection?

10.    Finally, there exists two other issues as to Count-1:

A.    While the judge failed his duty to instruct the jury as to drug testing law and requirement, in another error patent, the judge allowed the prosecutor — in his closing statement — to put forth, erroneously, to the jury that the "presumptive positive" drug screen was legally sufficient for the jury to find petitioner guilty; specifically, the DA called the "Presumptive Positive" drug screen "irrefutable evidence" — however, as shown above, it is — indeed — refutable, refutable beyond a reasonable doubt (per law); Trial Rec. p. 1703.

B.    In a rather suspicious, prejudicial manner of the judge — as an aside fact:
(i)    The trial judge allowed petitioner to be illegally, erroneously convicted on a

9

"Presumptive Positive" drug screen without confirmation; and^ ;

(ii)    To prevent impeachment or discrediting of state's key witness Lisa Gautier, the judge allows the state to exclude fact of Gautier's presumptive positive drug screen for methamphetamine in Gautier; Trial Rec. Pp. 411-412, 410-412,

## CONCLUSION
### (Claim-1)

No element of Count-1 was proven; no confirmation of drugs (cocaine) in the child; no showing of required serious injury caused by the conduct as required; no drug test confirmation test was conducted, prohibiting the presumptive test from being used as a basis for sanction/punishment/finding of guilt; the judge-having drug test case and law familiarity is without excuse for failing to instruct the jury on such law; the jury verdict was thus uninformed, irrational, and contrary to law; the prosecutor was allowed to erroneously state a presumptive test was irrefutable; in light of all facts, there exists the most probable reality of reliable hypothesis of innocence, and, resultingly, petitioner's rights to due process and equal protection of the laws were violated which results in his unconstitutional conviction and life sentence without parole . . . to rule otherwise would simply be to avoid actualities of fact and law; reversal of conviction is mandatory — not being subject to harmless error review where the error is structural, and, such error infected the entire trial with unfairness.

10

## RELIEF SOUGHT
### (Count-1)

Post Judgment Acquittal and/or reversal of conviction.

## CLAIM-2
### (Count-2)

Constitutionally Violative Suppression of Evidence

### Preface

Where, in part, this claim relates to a flash-drive at evidence in trial, and noting that the submission of the flash-drive in direct appeal was rejected for review, the following warrants petitioner's request said flash-drive be ordered as part of the trial record for review and that it be ordered from the trial court (not prosecutor, who could alter it); noting, if the Court claims it no longer has the flash drive, petitioner requests to submit a copy for review.

By necessity, the following includes a brief history of the case and related facts.

### Standards of Review
### (Claim-2)

A.    Petitioner herein incorporates the: Global Standards of review; A-F.

B.    LSA-La. C. Cr. P. art. 821 requires that a conviction be based upon proof sufficient for any rational trier of fact . . . to find that the essential elements of the crime had been proven beyond a reasonable doubt; Jackson, supra, at 433 U.S. 307, 319, and, 99 S.Ct. 2781, 2789 (underlined emphasis added).

C.    When applying circumstantial evidence, LSA-R.S. 15.438 provides that the Jackson standard of review, incorporated into Art. 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt; when analyzing

11

circumstantial evidence, 15:438 provides that the fact finder must be satisfied the <u>overall</u> evidence <u>excludes every reasonable hypothesis of innocence</u>; <u>Palomo</u>, supra, at 420; <u>Neal</u>, supra, at 657 (underlined emphasis added).

D.   A reversal requires application of the manifest error doctrine.   The Court must review the <u>entire record</u> de novo for properly admitted evidence that establishes <u>a reasonable factual basis</u> for the trial court's finding.   If such basis does not exist, the . . . Court must conclude that the fact finder is clearly wrong or manifestly erroneous; ***State v. Interest of Art.***, 206 So.2d 1081, 51,053 (La. App. 2nd Cir. 9/28/16). (underlined emphasis added).

E.   Suppression of evidence by prosecution of evidence favorable to defendant upon request violates due process, where evidence is material either to guilt or punishment, irrespective of good or bad faith of prosecution; ***Kyles v. Whitley***, 514 U.S. 419, 115 S.Ct. 1555, at HN-1 (U.S. (La) 1995); See also—***Brady v. Maryland***, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); See *id.*, at 86, 83 S.Ct., at 1196 (relying on ***Mooney v. Holohan***, 294 U.S. 103, 112, 55 S.Ct. 340, 341-342 (1935); and ***Pyle v. State of Kansas***, 317 U.S. 213, 215-216, 63 S.Ct. 177, 178-179, 87 L.Ed. 214 (1942); and, ***Moore v. Illinois***, 408 U.S. 786, 794-795, 92 S.Ct. 2562, 2567-2568, 33 L.Ed.2d 706 (1972).

F.   One does not show *Brady* in withholding favorable evidence by demonstrating that some of inculpatory evidence should have been excluded, but by showing that <u>favorable evidence could reasonably be taken to put the whole case in such a</u>

different light as to undermine confidence in verdict; *Whitley, supra*, at HN-7 (underlined emphasis added).

G.      When probative force of evidence depends on circumstances under which it was obtained . . . indication of conscientious police work will enhance probative force and slovenly work will diminish it, for purpose of sloppiness of pol investigation is material, as required for *Brady* violation; Whitley, *supra*, at HN-16 (underlined emphasis added); U.S.C.A. Const. Amends. 5, 14.

H.      Under *Brady*, suppression of material evidence justifies a new trial, irrespective of one, good or bad faith of the prosecution;

## ARGUMENTS

## PREFACE

The Court should keep in mind that the illegality and unfairness of Count-1 most certainly infected the entire +not-especially where, in the following claim other witnesses did, in fact, receive leniency of state for testimony and/or were coached to plead the 5th to avoid prosecution of purported illegal activity their testimony would connect them to.

Further, it is necessary to set out a basic history of the development of the case so the Court may connect the relevant dots; as such, the following is Presented in Sections:

## I.

## Count-2/A Historical Investigation

1.      The prosecutor opens his case by admitting the case developed upon a "Historical Investigation" as opposed to a typical investigation; Trial Record, p. 692; to wit:

13

**A.**     As a result of the original detective having the case (Mario Arthur) (Trial Rec. p. 758), Chief Kevin Swan testifys the case was never worked on by Mario for over 1-year (including other cases); then the case was assigned to Detective Luke Irwin (Trial Rec. p. 762).

**B.**     Trial record p. 764 reflects Irwin failed to report a known conflict to the case —being Irwin had a 6-year sexual relationship with State's key witness Lisa Gautier (Trial Rec. p. 914) characterized by Gautier as "Rape" (Trial Rec. p. 298), and,

(i)     Irwin authored the entire investigative report; Trial Rec. p. 29)

(ii)     Irvin conducted all but one interview of the witnesses; Trial Rec. p. 299

**C.**     All investigation was conducted over 1-year <u>after</u> the alleged crimes; Trial Rec. Pp. 758, 762.

**D.**     Detective Knight:  "Had a proper investigation been conducted they could have investigated the residence . . . a search warrant of the house would have been crucial;" Trial Rec. p. 831.

**E.**     The "Historical Investigation" produced <u>no direct evidence</u>; no arrests for possession, sales, and manufacturing of crack cocaine—as alleged.

**F.**     Rather, the entirety of the state's case as to <u>Count-2</u> was premised <u>entirely</u> upon the testimony of state witnesses; which primarily included:

(i)     Detective Irwin and Lisa Gautier, whom, as it will be shown following, the judge recognized both as involved in corruption of the case and other associated illegal activities;

14

(ii)     Other witnesses having criminal histories with pending cases and facing serious punishment—of which the following claim will show said witnesses were coached to plead the 5th to avoid prosecution in testimony and/or being given other state leniency.

G.     As to the case corruption of Irwin and Gautier (as stated in F., (i) above), as this and following claims are presented the Court will see an underlying plot of Gautier to deceptively obtain custody of petitioner's minor child to which Irwin assists and of which petitioner asserts—in his attempt to expose said corruption/illegal activities—this case, an erroneous case, was developed to put petitioner out of the picture and hide the activities of Irwin and Gautier (and their associates).

## II.

### Corruption of Witnesses and Flash-Drive Evidence Suppression

1.     It should be kept in this Court's peripheral thought the fact that the flash-drive evidence:

A.     Contains at least 3-hours of phone calls recorded by Gautier—between Gautier and Irwin; Trial Rec. p. 865 (of which defense counsel asked the entirety to be played before the jury; and the judge refusing to play the entire recording).

B.     Gautier, herself, brought said flash-drive evidence to defense counsel.

(i)     She recorded the calls because she did not "trust Luke [Irwin] at that point"; Trial Rec. p. 917 (because Irwin had threatened Gautier concerning her probation and kids). (Bracketed name for clarity).

15

C.      The judge characterized the flash-drive as creating a "trial within a trial"; Trial Rec. Pp. 322-323; i.e., a case developing within the instant case against the state's key witnesses.

2.      Historically, petitioner (with members of a concerned citizen's group) (Tr. Rec. p. 725) took the flash-drive to police internal affairs to expose the corruption and illegal activities thereon, (Tr. Rec. p. 725) and from that point the flash-drive was given to the very prosecutor of the instant case (Tr. Rec. p. 725),

It can be noted here, as will be shown in Claim-4, petitioner was unaware defense counsel's entire case work product was on the flash-drive (i.e., trial strategy, witness examination questions, etc.), and, that before turning the flash-drive over to counsel as law requires—the DA copied it and reviewed it; Trial Rec. Pp. 676, 726.

3.      When it comes to evidence—the admitting or disallowing thereof—under the premise of Morrisey, supra, 92 S.Ct. at 2600, the precise nature of the trial court/judge is to be a non-biased, impartial gatekeeper; which would include allowing relevant material evidence in favoring relevant material evidence in favorable to petitioner; Whitley, supra, at HN-7.

4.      Accordingly, the flash-drive facts, exposing the case corruption of Irwin and Gautier are: (Not all inclusive)

A.      Where the trial judge first recognized the flash-drive as containing case corruption evidence (Trial Rec. Pp. 403-404, 405, 997, 1011, 1015-1016, 1035 and 1051), of which the judge assessed same as creating a "Trial within a tr" ((Tr. Rec. Pp.

322-323), Detective Irwin, Gautier (and prosecutor) thought this 2nd (trial in trial) investigation would mess up the First (instant case) investigation (Trial Rec. Pp. 1045, 1055). See also Exhibit Five.    And noting Irwin wanted Gautier to create a fake recording to cover up his and Gautier's sexual relationship ((Tr. Rec. p. 1056).

B.    Irwin to Gautier: (recorded calls)

(i)    "I can push the system (investigation) the right way:; Tr. Rec. p. 299 (Parenthetical fact for clarity).

(ii)    Irwin stated he could "Stop those who run their mouth:; (Tr. Rec. p. 301) (referring to petitioner and defense counsel and their attempt to expose said corruption).

(iii)    Irwin stating he has the ability to pull in favors; (Tr. Rec. p. 299)(and that he will pull in favors if they run their mouth).

(iv)    Instructs Gautier he can assist her in fleeing the State with a name change so as not to be found; (Tr. Rec. p. 300)(refers to fleeing after obtaining custody of petitioner's minor child).

(v)    Irwin tells Gautier he will put pressure on Dragon (Brian Dragon—defense counsel); (Tr. Rec. p. 301.

(vi)    In reference to Irwin being investigated as to his case corruption and illegal activities "I can go to jail for that!" (Tr. Rec. p. 302) (Hence, Irwin had a motive to keep in contact (and conspire) with Gautier despite being recused from the case and to refrain from witnesses; (Tr. Rec. p. 1627)

17

(vii)   Irwin to Gautier:  Everything is on track. . .I promised you I would take care of things. . .it just takes time to push them the right way.   I don't like people to run their mouth, and when they run their mouth, I have the ability to pull in favors (and then informs Gauthier to stay "low key until the case is over and everything will blow over); (Tr. Rec. p. 1627).

C.   There are many other judge-suppressed recordings on the flash-drive relevant to:

(i)   Irwin, by request of Gautier, to assist Rushing with help   on   his pending gun charge (for testimony); (Tr. Rec. p. 1623).

(ii)   Other illegal activity between Irwin and Gauthier—including Gautier's providing Irwin and other officials with strippers/prostitutes for private parties conducted in Biloxi; (Tr. Rec. p. 1014).

## III.

### Trial Judge's Improper Suppression of the Flash-Drive

1.   Despite the following facts, the judge later refuses to allow this favorable evidence to petitioner (in violation of *Brady*, per *Whitley*, at HN-7)at trial:

A.   The judge sees the evidence of case corruption and other illegal activities of state witnesses as creating a "Trial within a trial" against said state witness; Trial Rec. Pp. 322-323.

**B.**   Commenting on the relevancy of favorable evidence to petitioner as to the flash-drive, the judge states:

(i)   "How could anything be more relevant to whether a case is being a bias or corruption"; (Trial Rec. Pp. 3030-304) ("I think that's totally relevant as to whether there was a corruption").

(ii)   "I think its totally relevant; (Tr. Rec. p. 405) (Relevant to Irwin's plan to assist Gautier in her underlying plot to disappear without trace after deceptively obtaining custody of petitioner's minor child).

(iii)   As to Irwin stating he could push the D.A. the right way—"It shows possibility of corruption"; Trial Rec. Pp. 996-997).

(iv)   "She [State's key witness Lisa Gautier] was the one that was taping this. She is the one showing that there is evidence of corruption and its here on tape"; (Tr. Rec. p. 1011) (bracketed text/name added for contextual clarity).

(v)   "In the tapes there's evidence of corruption"; (Tr. Rec. p. 1015) ("Its for the investigation. . .that's corruption.")

(vi)   I think it needs to get before the jury, the ev of possible corruption"; (Tr. Rec. p. 1016.)

(vii)   "We're not there to protect any particular person"; (Tr. Rec. p. 1020) (in reference to protecting corrupt state key witnesses involved in case corruption).

(viii)   "Wait. wait.   And, Luke [Detective Luke Irwin] says he will call and say to Brian [Brian Dragon/defense counsel] for him to lighten up or I'll out the pressure on

him."; (Tr. Rec. p. 1022) (Bracketed text/names added for contextual clarity).

(ix)   "It still shows that he [Detective Irwin] is, you know, hey, I've done something wrong,"; (Tr. Rec. p. 1025) (Bracketed text/names added for contextual clarity).

(x)   To state's key witness, Gautier, "Ma'am, do you recall Luke Irwin on May 10, 2016, when you indicated to Luke that you had as much dirt on him as he had on you?" Answer. "yeah"; (Tr. Rec. p. 1028).

(xi)   "I'm also responsible getting before the jury what you have on your. corruption"; (Tr. Rec. p. 1051).

C.   But in response to the D.A's repeated objections causing multiple side bars:

(i)   From D.A. statements such as "How easily this case will get out of control (D.A. referring to the "trial in a trial" developing against his key witnesses) if we do not limit the scope of what this external information (the flash-drive corruption evidence) that surrounds Luke Irwin"; the judge begins to act to limit the scope of flash-drive evidence —allowing some evidence "but not to make it such a sideshow that it gets away from this case"; (Tr. Rec. p. 1051)(Parenthetical text added for contextual clarity); noting, the judge is now acting in prosecutorial mode, sacrificing favorable evidence to petitioner to assist the D.A. in securing a conviction—despite the judge—admitted case corruption.

Judge: "However, playing the whole doggone tape, no!" (Tr. Rec. p. 865) (Hence, the eventual suppression of favorable evidence on case corruption by state witnesses despite judge's previous declaration of the relevancy and duty to get such infringement before the jury.

2.    The above facts of record:

(i)    Violate every standard of review presented in this claim.

(ii)    The error is structural, the· trial already being infected with unfairness relevant to Count-1 and the suppression of the flash-drive only contributing all the more to an irrational, uninformed jury verdict—a verdict not reliable and an error not subject to harmless error review.

(iii)    The flash-drive, under Whitley, HN-16, and U.S.C.A. Const. Amends. 5 and 14, was favorable evidence—in that its relevant materiality circumstantial evidence, and that (as shown in the previous section) being testimony of corrupt state key witnesses—a suppression which prevented the jury from making a reliable, informed assessment as to witness character and the credibility thereof; a fact which petitioner asserts would have changed the outcome of Count-2 verdict to acquittal (notwithstanding, Count-2 fairness was already tainted by unfairness of Count-1 and jury also uninformed there—as to legality of Count-1 legal requirements prohibiting a guilty verdict).

## IV.
## Other Improper Suppressions

1.    As previously touched on in Claim-1, at 10., B., where the judge did (improperly) allow petitioner to be prejudiced by presentation of (unconfirmed) presumptive positive drug screen (and certainly going to character), the judge suppressed inclusion (and cross-examination) of Gautier's presumptive positive drug screen of which she tested positive for methamphetamine, (Tr. Rec. p. 410) which, in light of section V above, not only

21

obstructs effective cross-examination right (Cronic, at 204)) but which also deprived the jury of making an informed assessment as to credibility of Gautier and her testimony—noting, Gautier was also then on probation for food stamp Fraud (Tr. Rec. p. 701) and where Fraudulent conduct constitutes deceptive behavior:

2.   Where petitioner has touched on Detective Irwin's conflict as investigator in the case due to previous sexual relationship with state's key witness Lisa Gautier (Section I, 1., B. above) for which was recused after completing the case investigation and report (Tr. Rec. p. 1627), one judge denied effective cross-examination (Cronic, at 204)) when defense counsel sought to enter into evidence the phone records of Irwin and Gautier to show—consistent with case corruption—that Irwin, in fact, kept almost daily contact with Gautier despite said recusal; the pertinent, relevant facts thereto are:

A.   The Trial Rec. Pp. 1628-1629, reflect defense counsel questioning Irwin about the above daily phone calls; Ibid, 1628

B.   Irwin falsely states there were only about 14-calls; Ibid. 1628; and denying that he called Gautier daily.

C.   Defense counsel, as a precursor to submitting phone record evidence, inquired if Irwin would be surprised that from June 1, 2015, to June 1, 2016, Irwin made 360 calls.

D.   Defense counsel then attempting to submit phone records of Irwin and Gautier caused a D.A. objection and side-bar (Ibid., 1629).

E.      As a result of the D.A.'s objection and side-bar, the judge suppressed the entry of said phone records to evidence (Ibid., 1629-1630) because the custodian of the record was not present; noting that Exhibit-1 shows:

(ii)    Notarized "verification of authenticity" of phone records signed by the custodian/record provider—which, typically, when just showing call dates (and not call details) is sufficient for evidence with certified affidavit before notary for trial/evidence.

For cross-examination, the jury was prevented by the improper suppression of verifying Irwin's tendency to provide false testimony, preventing an informed assessment of the case detective's character.    The valid materiality would have went to the aforementioned corruption of Irwin and Gautier—verifying the shadiness of Irwin's investigation (as to police work; see Whitley, *supra*, at HN-16).

3.      The judge prejudicially suppressed the affidavit/letter of Alvin Davis, favorable to petitioner's exoneration, as "cumulative"; noting:

A.      Originally, the  trial judge ordered Davis to appear to testify; Trial Rec. Pp. 281-282.

B.      The D.A. received Davis's letter nearly 3½ months prior to trial; and while the state has an obligation to provide continuous discovery (Brady/ *supra*; LSA-La. C. Cr. P. art. 729.3, see ***State v. Vaccaro***, 411 So.2d 415 (1982) — indicating a failure thereto should result in the granting of a new trial) the state denied knowledge thereof but it was discovered, in fact, the State even went to Angola to interview Davis concerning said letter.

C.    And while the Court allowed the State to produce witnesses testimony to substantiate many of the same allegations, the Court later denied Davis's testimony as cumulative <u>to show witness Rushing had actually attributed the presumptive positive drug screen of the child at issue to Lisa Gautier</u>, and noting it was not as cumulative compared to multiple state witnesses allowed and only one other defense witness (Pete Snyder) who testified Rushing lied about petitioner being responsible for cocaine in the child to get a 10-year leniency deal (which is <u>exactly</u> what Rushing received subsequent to his testimony). Again, the suppression goes against defense showing state witness testimony as false/discredited.

Touching on Pete Snyder's affidavit that set out Rushing bragged about providing false testimony to get a lenient 10-year sentence when facing life in prison in a separate case concerning Rushing:

(i)     The state contended Snyder recanted, which the Court tended to agree with; (Tr. Rec. p. 26).

(ii)    But Snyder <u>did not recant</u>, he merely said—when shown his affidavit—that it was "not exactly the way it was said. . <u>but</u> "—the "But" indicating the affidavit was true nonetheless. See Snyder's affidavit, <u>Exhibit-2</u>

3.    The state suppressed evidence of offer to speak in behalf of Rushing for his testimony (not as promise but providing hope of leniency), as will be detailed in Claim-3, following; a claim revealing state coaching/deals for adverse testimony.

24

4.   The state failed to disclose the identity of of DCFS investigators.

A.   A material witness, Ms. Kelsey Bougeois, was unavailable to attend trial due to a serious of medical reasons.

B.   The state informed defense counsel of said unavailable approximately one week before the commencement of the trial; Bougeois was the Department of Children and Family Services investigator that investigated the initial complaint...a fact the state withheld that Stacy Williams—who was not beyond process of Ct—also investigated, but was not mentioned in any DCFS report.

C.   Had the state disclosed the above, Williams would have been called to impeach the testimony of both Gautier and her daughter Marilyn Tapia—who gave multiple conflicting testimony regarding the issue with the child in the case; of which upon testimony of Williams's the verdict would have been different.

D.   The above facts were claimed in a denied motion requesting a new trial.

## CONCLUSION
### (Claim-2)

Concisely stated, had the aforementioned improper suppressions not occurred, the verdict would have been acquittal not guilty.   For multiple reasons in both counts, the jury's verdict was uninformed and therefore, not reliable.   The suppressions, by abuse of discretion, denied petitioner right to due process and a fair trial.

25

## Relief Sought
### (Count-2)

### Reversal of Conviction

### Claim-3

Contrary to the state's erroneous claims of no deals for witness testimony, other witnesses (Besides Irwin and Gautier) were either coached to plead the 5th to avoid any trial for their purported involvement and purported illegal activities related to the allegations and/or they received state leniency to reduce penalties in their own separate criminal case—proven by the record and violating pet's Constitutional rights of due process and the equal protection of the laws.

### Standards of Review

A.   The possibility that the prosecution may have leverage over a witness due to that witness's pending criminal charges is recognized as a valid area of cross-examination; *State v. Burbank*, 893 So.2d 109 2001-0831 (La. App. 4th Cir. 2004); LSA-R.S. 15:492.

B.   Impeachment, as well as exculpatory evidence, falls within the *Brady* rule; *U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 763, 766, 31 Ed.2d 104 (1972).

C.   A witness's hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest, as is the witness's arrests or pending criminal charges, or the prospect of prosecution, even if the witness has made no agreements with the state regarding his conduct; Burbank, *supra*, HN-5; U.S.C.A. Const. Amend. 6; LSA—Const. Art. 1, § 16; LSA-R.S. 15:492; see also *State v. Vale*, 666 So.2d 1070 at 1071 (La.1996).

26

D.      Where a key witness has received consideration of potential favors in exchange for testimony and lies about those favors, the trial is not fair; ***Tassin v. Cain***, 517 F.3d 770, at HN-4 (*Giglio* and *Napue* set a clear precedent as such; Tassin at 778).

E.      The petitioner herein incorporates his "Global Standards of Review", p-2, A-F).

## Arguments

Preface:  Because this claim involves multiple state witnesses, for order, petitioner be set out the facts following by individual sections for each witness:

### I.

## State Witness Kelvin Rushing

1.      Detective Knight testified to Rushing as:

A.      A career criminal; (Tr. Rec. p. 859).

B.      A psychopath and a liar; (Trial Rec. Pp. 861-861).

C.      A drug dealer and a pimp; (Tr. Rec. p. 1213)

D.      Rushing described as looking to "fool" people; (Tr. Rec. p. )

E.      Rushing begins "numerous" communications with Detective Knight; (Tr. Rec. p. 856)

F.      The above communications (letters) had the purpose of seeking leniency for testimony; (Tr. Rec. p. 858.) (856-858).

G.      Because Detective Knight did not believe investigators could prove the case

27

with evidence, Knight sought Rushing's testimony to overcome that fact; (Tr. Rec. p. 859.

H.   Rushing provided testimony because he thought he could get off (from penalty in his own criminal case); (Trial Rec. Pp. 862, 870)

I.   Not knowing Lisa Gautier was also recording Knight's calls with Gautier, Knight admits to stating in such a call:

(i)   I'm trying to help---Kelvin (Rushing); (Tr. Rec. p. 863); and it was also discussed "that doesn't matter if people were lying to us or the jury" (Trial Rec. Pp. 861-862; see also (Tr. Rec. p. 1031 Irwin telling Gautier he had done everything to protect Rushing on the gun charge).

(ii)   And showing Knight's interest toward Gautier "you are one of my star witnesses and I have to make you happy"; (Tr. Rec. p. 867).

2.   Prior to trial, the D.A. admits Rushing <u>had hope</u> of a deal—even without promise; (Tr. Rec. p. 13).

3.   It is a fact of record that Rushing was <u>pending sentencing</u> in his own criminal case <u>under a multiple offender charge</u> and facing <u>life imprisonment</u>; a sentencing that was <u>postponed</u> until <u>after petitioner's trial</u> and Rushing's testimony against petitioner; (Tr. Rec. p. 1329 (Bill pending *Ibid.* 1099; to which Rushing admits (*Ibid.* 329, 331).

4.   Rushing also sought leniency help from Gautier because Gautier had a relationship with and was working with Detective Irwin to develope a case against the petitioner—and would testify <u>when</u> he thought <u>it would help him</u>; (Tr. Rec. p. 870) (including with a separate gun charge which Irwin said he would try to assist with; (Tr. Rec. p. 1333); noting

28

**A.**   The suspect fact Gautier was putting money on Rushing and Gregg's jail phone accounts to keep contact (Tr. Rec. p. 1381) with Irwin testifying that Gautier and Rushing were "associates" (Tr. Rec. p. 1635).

**B.**   In a letter by Rushing to Gautier, containing his adamancy to get help (leniency) and reulin betrayed by Gautier, Rushing (page 2-3 thereof) states he could have testified to "turn the tables" (from petitioner) upon guilt of Gautier concerning the child; (the letter is a matter of trial record/evidence).

5.   Rushing, prior to testifying against the petitioner, was bragging to inmates he was ~~incarcerated with that~~ he had an "unofficial deal" with the prosecution, and states the lenient sentence would be around 10-years, and, that he fabricated testimony to obtain the unofficial deal; see Exhibit Two; and noting:

**A.**   In fact, after providing testimony, Mr. Rushing, indeed, received exactly 10-years. . .a deal his sentencing judge pointed out as an extremely good deal; Exhibit Four as reported by the advocate.

**B.**   And again noting:

(i)   Snyder did not recant Exhibit Two; he merely stated the affidavit wasn't exactly written as the information discussed, stating "But" — indicating the affidavit was true nonetheless.

(ii)   And, the judge's improper suppression of Alvin Davis as "cumulative" when Davis was the only other inmate testifying to Rushing's erroneous testimony (contrasted to the judge wallowing multiple cumulative witnesses for the state).

6.    The violation of <u>Brady</u>, <u>Giglio</u>. <u>Bagley</u> exists where:

A.    The state did not disclose the deal — whether official or not; the fact is, Rushing was told by the D.A. <u>that they would speak in his behalf at</u> his sentencing. (Tr. Rec. p. 1377).

B.    At (Tr. Rec. p. 1332), Rushing lies and states no deals were offered; no promises made (Tr. Rec. p. 1333).

C.    But the facts above show:

(i)    In multiple ways, via Detective Knight, Detective Irwin, the D.A, and Lisa Gautier who had connection to Irwin, Rushing indeed was seeking and hoping for leniency.

(ii)    While Rushing was promised no official deal, he was led to have hope his testimony may reduce his own sentencing.

(iii)    And, in fact, Rushing's sentencing being postponed until after petitioner's trial, Rushing received the <u>very good</u> deal of 10-years <u>as a 1ˢᵗ offender</u> when facing 20-life <u>as an actual 4ᵗʰ offender</u>.

D.    The state failed to correct the false testimony of no deal or hope or belief for leniency for testimony; a <u>structural</u> violation concerning <u>Tassin</u>, <u>Brady</u>, and <u>Burbank</u>, *supra*.

## II.

### State's Witness/Ashley Mason

Petitioner asserts that the D.A. coached Mason to plead the 5th with
Mason fearing prosecution if she did not testify to please the D.A.

1.    At (Tr. Rec. p. 1662) the D.A. claims in closing argument no deal was given to Mr.

Rushing — similar to claiming Mason and others received no favor or leniency for

testimony.

2.    However, the D.A. himself inadvertently exposes Mason was coached to plead the

5th (to avoid prosecution):

    A.    The D.A. states to Mason on the stand "you agreed to plead the 5th?"   (Tr.

Rec. p. 1313); to which Mason responds in the affirmative.

    B.    And the unavoidable fact, one cannot "agree" to plead the 5th unless asked

(or coached) to plead the 5th.

3.    It may then be presumed that the D.A. also coached other witnesses facing

prosecution of criminal charges.

## III.

### State's Witness/Kayla Gregg

1.    Gregg was the other defendant in the instant case; previously charged with the

same alleged crimes as the petitioner.

2.    Gregg answers that she would do anything to get out of trouble, when asked by

defense counsel; (Tr. Rec. p. 1234).

31

3.   The benefit is, in part, Gregg would not have any testimony used against her; (Tr. Rec. p. 1165), and Gregg then takes the 5th (Tr. Rec. p. 1169).

4.   Gregg was out of prison in 2010 and has a series of felony convictions; (Trial Rec. Pp. 1173-1174).

5.   Rushing became her boyfriend prior to the alleged event with the child; (Tr. Rec. p. 1211).

6.   It may be noted — for credibility — that Gregg <u>falsified a notarized document</u> giving <u>provisional custody</u> of the child to Gautier; (Trial Rec. Pp. 1237-1242).

7.   "In order to get your [Gregg] to testify did the state have to offer you immunity?" Gregg's response: "yes"; (Tr. Rec. p. 122).

8.   As another benefit for testimony, Gregg's charge was reduced to — child desertion; (Tr. Rec. p. 1228).

9.   Gregg admitted she was then currently in jail for burglary; (Tr. Rec. p. 1234).

10.   As another benefit for testimony, the state agreed <u>not to multiple-bill Gregg</u> where she was facing 20-life; (Tr. Rec. p. 1234).

11.   Resultingly, for testimony, Gregg received a sentence that would allow her to be out of prison after completing a Re-entry program <u>in 2-years</u>; (Tr. Rec. p. 1324)(noting this sentence is for her separate criminal burglary case; and Gregg only received 90-days as a misdemeanor as defendant in the instant case].

## IV.

### State's Witness/Marshae Navarre

1.      Navarre has a series of felony convictions; (Tr. Rec. p. 1393).

2.      Navarre also had pending charges; *Ibid.* 1393

3.      Rushing is her ex-boyfriend; (Tr. Rec. p. 1395)

4.      While no deals are claimed, it may be noted in <u>Claim-5</u> that Navarre's testimony was in favor the <u>Claim-5</u> factual <u>plot</u> of Gautier asserted by petitioner.

## CONCLUSION
### (Claim-3)

The record clearly reveals Rushing had hope of leniency — first requesting leniency and stating he would testify <u>if</u> it would help him, and, the hope bolstered by the D.A. who told Rushing while he made no promises that the officials related to Rushing's individual criminal case would be informed (before Rushing was sentenced) that he had cooperated in on instant case; notwithstanding, Rushing's clear discredibility, the state orchestrated testimony from Rushing of not receiving any deal to hide the state's failure to reveal the deal which was to seek favor for Rushing this violates <u>Brady</u>, *supra*, as well as <u>Burbank</u> and <u>Tassin</u>.

And clearly, Ashley Mason was coached to plead the 5th by the D.A. (and not a defense counsel); the state failed to reveal that deal for immunity as part of its case plan — but the D.A. did inadvertently expose the matter by evoking from Mason she had been <u>asked</u> (or coached) to plead the 5th; to this, petitioners asserts:

33

A. This coaching tactic may be presumed in any witness in the case (e.g., Kayla Gregg, Marilyn Tapia), where employed with Mason; and,

B. Same was employed as part of the prosecutor's newly developed strategy from his improper acquisition and reviewing (and copying) the defense counsel's case files (e.g., trial strategy, witness questions, notes, etc.); which improper review of that work product (case files) in <u>Claim-Four</u> following.

<u>Relief Sought</u>
(Claim-3)

Reversal of Conviction

<u>Claim-Four</u>

The trial was not fair wherein the D.A. acquired the defense counsel's case files (work product including trial strategy, witness questions, etc.) and failed to immediately turn over said files but rather copied said files, reviewed said files <u>and then used that information to his advantage.</u>

1. The trial record concerning this matter can mostly be reviewed at Pp. 673-676 and 724-743.

2. The essential facts are these:

A. As lightly touched on in a previous claim concerning <u>the flash-drive evidence</u>, state's key witness, Lisa Gautier, fearing repercussion from her case corruption involvement exposed on the flash-drive, brought said flash-drive to defense counsel.

B.      Petitioner, along with members of a concerned citizen's group, took the flash-drive (a copy thereof) to police internal affairs with the intent to expose the corruption and illegal activities thereon; (Trial Rec. Pp. 725, 729-730, 32, 734).

C.      Internal affairs turned the flash-drive over to the prosecutor — obviously for investigation and possible charges against Detective Irwin (and others); however, it was the prosecutor of the instant case to whom the flash-drive was given; (Tr. Rec. p. 676).

D.      Rather than turning the flash-drive over to defense counsel (or destroying it) as procedure would require when the D.A. discovered that defense counsel's entire case files and notes were on the flash-drive (i.e., trial strategy, witness questions and other notes), the D.A. assigned a review team to review the flash-drive; (Trial Rec. Pp. 673, 740, 744).

E.      The Court ordered the defense counsel's work product (case files/notes) to be deleted, and, (Tr. Rec. p. 740).

(i)      Then gave the flash-drive back to the D.A. (Tr. Rec. p. 744); noting the Court was unable to open a particular file format for some such files and merely ordered the D.A. not to open them.

(ii)     Defense counsel asserted the compromise to the defense was a bell rung that could not be unrung (Tr. Rec. p. 674) and the judge stated the acquisition/review of the flash-drive by the D.A. was pretty serious breach (Tr. Rec. p. 674).

E.      Despite the serious breach, no mistrial was ordered.

F.    And, it is a _fact_ that the D.A. admitted he had another (undeleted) copy; (Tr. Rec. p.   ); noting

(i)    It is impossible to determine how many copies the D.A. had before _and during_ trial.

(ii)    Most certainly it can be presumed the D.A. used the defense counsel's work product (case files) to his advantage in prosecution; the presumption can be reasonably assessed where the D.A. already violated the legal requirement to turn the material over immediately---and did not (rather, defense counsel discovered the acquisition and review thereof himself).

## CONCLUSION
### (Claim-Four)

The trial was unfair where the prosecutor possessed, reviewed, and used to his prosecutorial advantage the defense counsel's case files upon the flash-drive.

### Relief Sought
### (Claim-Four)

### Reversal of Conviction

### Claim Five

Notwithstanding legal invalidity of Count-1 conviction and sentence by uninformed jury ignorant of legal requirement of necessary drug test confirmation to find guilt, and that being combined with testimony for state by corrupt witnesses (recognized by Court as corrupt) and other witnesses with criminal charges obtaining either immunity and/or leniency for adverse testimony,

36

there exists an underlying plot which results in the development of this erroneous case against petitioner — in the which state key witness Lisa Gautier consorted/collaborated with other state witnesses to develope a false case against petitioner as part of Gautier's agenda to deceptively obtain custody of the child at issue without petitioner's consent and to do anything it took to remove petitioner from the picture to fulfill Gautier's agenda.

### Standard of Review

Petitioner incorporates the "Global Standards of Review" A-F and the premises of Strickland, *supra*.

### Arguments

1.   The record reflects that Rushing sent a December 6 letter to Gautier that:

**A.**   Spoke of her (Gautier's) plan to steal the baby away from petitioner; (Tr. Rec. p. 1361).

**B.**   Spoke of Gautier getting petitioner sent to prison to fill her (Gautier's) agenda; (Tr. Rec. p. 1370).

2.   The record reflects that state witness Tanieka Ducre testified.

**A.**   She witnessed Gautier and Gregg discussing signing of custody papers — giving custody to Gautier, and, that petitioner would refuse to sign such papers; (Tr. Rec. p. 1476).

**B.**   That Gautier stated she would obtain custody "some kind of way" (if petitioner refused giving Gautier custody); (Tr. Rec. p. 1746).

C.      That the "some kind of way" included doing "something bad" to petitioner (See 1. B. above) if petitioner stood in Gautier's way; (Tr. Rec. p. 1746).

D.      And overheard Gautier's and Gregg's "Plot" to take custody of the child against petitioner's will; (Tr. Rec. p. 1746).

3.      The record reflects that state witness <u>Marshae Navarre</u> testified Gautier had "a motive"; (Tr. Rec. p. 1395);;that Gautier seemed to want all of Gregg's kids (Tr. Rec. p. 1395) and petitioner did not want Gautier to have custody of the child (Tr. Rec. p. 1411).

4.      The record reflects that state witness Detective Irwin (recognized by Court as being involved in case corruption with Gautier):

A.      Admits Gautier discussed getting custody of petitioner's child; (Tr. Rec. p. 1623).

B.      Admits he would assist Gautier in fleeing the state with a name change so as not to be found (after obtaining custody — fearing Gregg may change her mind as to custody; (Tr. Rec. p. 1036); (Tr. Rec. p.   )

C.      Irwin also acknowledges Rushing's December 6 letter to Gautier — in which Rushing state's he knows that Gautier was the one who gave cocaine to the child; (Tr. Rec. p. 1627) (and that Rushing could "turn the tables" to point guilt at Gautier if betrayed with no leniency for his testimony; See Exhibit Three.

Here, the Court will note that while Rushing may have believed Gautier in fact administered cocaine to the child so that the child would test positive for cocaine (when Gautier had Gregg ask hospital staff for such test) (Trial Rec. Pp. 1243-44); as a method

to cause petitioner to lose custody, it remains the petitioner's belief — believing no reasonable person would ever administer cocaine to a child — that it was Gautier's combining of adult medications which Tapia and Gregg say Gautier administered to the child (Trial Rec. Pp. 1154-1155 and 1233-1234, respectively) that caused the false (unconfirmed) presumptive positive drug test result.

5.     Thus, the plot to obtain custody of petitioner's child — at the expense of sending petitioner to prison on this erroneously developed case to meet Gautier's agenda — is clear and obvious; further, contrary to such erroneous case other witnesses testified:

    **A.**     The mother, Gregg testified that she falsified the notarized provisional custody papers; (Trial Rec. Pp. 1237-1242).

    **B.**     The reality of state witness Ashley Mason's testimony is:

    (i)     Gregg was doing good with petitioner ((Tr. Rec. p. 1257);

    (ii)     No drugs were smoked in petitioner's house; (Tr. Rec. p. 1281).

    (iii)     That Gregg would leave petitioner and child at home to run the streets with Mason to smoke crack; (Tr. Rec. p. 1286) (notwithstanding, fact Gregg left petitioner to stay with Rushing to enjoy his drug — dealing/pimp life style (she could not experience at home with petitioner) (Tr. Rec. p. 1341).

    **C.**     Marsha Navarre met Gregg in a crack house ((Tr. Rec. p. 1395) was introduced to Gregg by Rushing as a "hoe" working for Rushing (*Ibid.* 1396).

    **D.**     Despite all the false testimony developed to depict petitioner as involved with drugs at his house:

(i)     Ashley Mason — no drugs, drug use in the petitioner's house; (Tr. Rec. p. 1278).

(ii)     Taniek Ducre —

(a)     Never knew Ashley Mason to ever be at petitioner's house (Tr. Rec. p. 1491)

(b)     Where Ducre went to petitioner's house at least every other day to check on the child and petitioner after Gregg ran off with Rushing; (Tr. Rec. p. 1491).

(c)     Ducre never saw Marshae Navarre at the petitioner's house either; (Tr. Rec. p. 1493).

(d)     That only petitioner and child were ever in the house after Gregg left petitioner for Rushing; (Tr. Rec. p. 1495).

(e)     That while Gregg was with petitioner, Gregg was doing good; (Tr. Rec. p. 1500). (until Gregg began running the streets) (Tr. Rec. p. 1501).

(f)     James Oliver ) petitioner's landlord) testified:

(i)     Has known petitioner "since a little tot"; (Tr. Rec. p. 1465).

(ii)     No increased traffic at petitioner's house; (Tr. Rec. p. 1467 (nothing landlord lives next door); no cars late at night (*Ibid.*)

(iii)     Petitioner never appeared intoxicated; (Tr. Rec. p. 1469)

(iv)     House was clean; (Tr. Rec. p. 468, and child kept clean, well — cared for (*Ibid*)

(v)     An occasional visitor at house, not a lot of people there; (Trial Rec. Pp. 1469-470

40

## CONCLUSION

The underlying plot of Gautier to deceptively obtain custody of petitioner's child and flee the state with a name change to as not to be found is obvious — with the intended help of the instant case investigator Luke Irwin.   All of the witnesses have some connection to Gautier — which goes to discredit of Gautier's character (i.e., associating with drug — dealers/pimps) and it is obvious by the above facts that Gregg was doing well with petitioner until she began  doing crack and ran off with Rushing and subsequently conspired with Gautier to obtain custody of the child without the petitioner's consent.

It is also obvious that Gautier would go to any length to obtain custody of the child, including building an erroneous case against defendant with her connections (Detective Irwin, Gregg, Rushing, Mason, etc.) to send petitioner to prison to remove petitioner as a way to meet Gautier's agenda.

Thus, the jury — being inflamed at <u>Count-1</u> without cause — failed to pay close attention to the details presented herein, and, any <u>rational</u> jurist could never render a guilty verdict upon such corrupt, devious collaborations.

## Relief Sought

### Reversal of Conviction

**WHEREFORE**, upon the facts abundant premises set out in this application for habeas corpus relief, the petitioner prays the Honorable Court will provide the requested relief of reversal of conviction and sentence.

Respectfully submitted,

Larry Bickham Pro Se #194310
Main Prison/Hickory-4
Louisiana State Penitentiary
17544 Tunica Trace
Angola, Louisiana 70712

42

## CERTIFICATE OF SERVICE

On this _____ day of _____, 2020, petitioner has ~~mailed~~ marked a

copy of the foregoing with its exhibits to the District Attorney.

Further, petitioner certifies that the exhibits are either originals or true and correct

copies of the documents as they are presented herein.

_____
Larry Bickham

Note:  Relief includes that the flash-drive evidence be part of the record for review.

43

**eFile-ProSe**

| | |
|---|---|
| **From:** | Angola E-Filing <EML-FED-ANG-Printers@LA.GOV> |
| **Sent:** | Tuesday, November 16, 2021 1:54 PM |
| **To:** | eFile-ProSe |
| **Subject:** | Angola E-Filing |
| **Attachments:** | DOC # 194310135237.pdf |

CAUTION - EXTERNAL:

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.