## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LARRY BICKHAM** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-2146** |
| **DARREL VANNOY, WARDEN** | **SECTION: "A"(5)** |

### REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.    Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.    *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Larry Bickham, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.    In October 2015, he was charged by bill of information with one count of second-degree cruelty to juveniles.[1]    In September 2016, the State filed a

---

[1]  State Rec., Vol. 1 of 14, Bill of Information, Parish of St. Tammany (charging one count of second degree cruelty to juveniles, on or about May 1, 2014, under La. R.S. 14:93.2.3).

superseding bill of information adding a second count of cruelty to juveniles.[2]   Before trial,

Bickham rejected an offer from the State to plead guilty.[3]   On November 18, 2016, a jury

found him guilty as charged on both counts.[4]   The State filed a motion for a new trial and a

multiple-offender bill of information.   On March 7, 2017, the trial court held a hearing and

denied his motion for new trial.[5]   On April 17, 2017, the defense stipulated to Bickham's

prior felony convictions, as amended by the State, and the trial court adjudicated Bickham as

a fourth-felony offender.   On count one, he was sentenced to life imprisonment without

benefit of probation, parole or suspension of sentence, and on count two, he was sentenced

to 30 years' imprisonment without benefit of probation or suspension of sentence, to run

concurrently.[6]

On appeal, Bickham asserted three counseled assignments of error: (1) the evidence

was insufficient to support the convictions; (2) the trial court erred in denying his motion

---

[2]   State Rec., Vol. 1 of 14, Superseding Bill of Information, Parish of St. Tammany (charging an additional count of cruelty to juveniles, occurring on or about April 28 to May 1, 2014, under La. R.S. 14:93(A)(3)).

[3]   The State offered to allow him to plead guilty to simple cruelty, (not a crime of violence) and receive a five-year sentence.   The State would dismiss the crime of violence. The trial court noted that it would give credit for time served and he would "have maybe a year in."   State Rec., Vol. 2 of 14, Trial Transcript (November 14, 2016), pp. 426-28.

[4]   State Rec., Vol. 1 of 14, Trial Minute Entry, 11/18/2016.

[5]   State Rec., Vol. 1 of 14, Minute Entry, 3/7/2017.

[6]   State Rec., Vol. 1 of 14, Sentencing Minute Entry, 4/17/2017; State Rec., Vol 8 of 14, Felony Sentencing Hearing, p. 1844.

for new trial based upon the State's allegedly using a flash drive containing defense work product; and (3) the sentences imposed were excessive.    He also raised four *pro se* assignments of error: (1) the evidence was insufficient to support the convictions; (2) trial counsel was ineffective for (a) failing to object to the testimony of Chief Swann, (b) failing to present a full defense when the trial court limited his ability to play pertinent parts of audio conversations between Lisa Gauthier and various detectives and witnesses, and (c) failing to object during closing arguments when the prosecutor mentioned "other crimes" evidence; (3) the trial court erred in reversing its original ruling and suppressing audios on the USB flash drive of Lisa Gauthier's recorded phone conversations; and (4) the trial court erred in denying the motion for new trial based on new evidence about Pete Snyder and Kelvin Rushing.    On February 20, 2018, the Louisiana First Circuit Court of Appeal affirmed his convictions and sentences.[7]    On January 8, 2019, the Louisiana Supreme Court denied his application for writ of certiorari.[8]

On or about May 3, 2019, Bickham submitted an application for post-conviction relief to the state district court.[9]    In that application, he raised two claims for relief: (1) the trial

---

[7]  *State v. Bickham*, 17-KA-1308, 2018 WL 947095 (La. App. 1 Cir. 2/20/18); State Rec., Vol. 11 of 14 (Tab 1).

[8]  *State v. Bickham*, 2018-KO-0412 (La. 2019), 260 So.3d 591; State Rec., Vol. 11 of 14.

[9]  State Rec., Vol. 11 of 14 (Tab 2), Uniform Application for Post-Conviction Relief and Memorandum in Support.    Bickham subsequently filed other applications for post-conviction relief in the state courts challenging the 10-2 verdict on the conviction for second-degree cruelty to a juvenile under *Ramos v. Louisiana*, 140 S.Ct. 1390 (2020).    The sentencing challenges were unsuccessful and do not pertain to these proceedings.    State

court allowed the jury to convict without any instructions on the law concerning the confirmation of presumptive positive drug screens; and (2) the trial court condoned prosecutorial misconduct in suppressing information and allowing false testimony by witnesses and restricting defense evidence.   He also incorporated several subclaims alleging that trial counsel was ineffective in failing to request a special jury charge and failing to object to the reference in closing argument to the positive drug screen, and appellate counsel was ineffective for not raising the jury instruction error on direct appeal.   The State filed a response arguing that Bickham is procedurally barred from raising claims that were either fully litigated on appeal or that were not raised in the trial court proceedings leading to conviction or on appeal, and that he failed to show a *Brady* violation or that he received ineffective assistance of counsel.[10]   On October 28, 2019, the state district court issued a ruling denying relief "[f]ollowing review of the Response by the Office of the District Attorney and for the Reasons asserted therein."[11]   On March 3, 2020, the court of appeal denied Bickham's first supervisory writ application on the showing made because he failed to include all pertinent documentation; however, the order allowed him to file a new writ application.[12]   On September 14, 2020, the court of appeal denied his second writ

---

Rec., Vol. 11 of 14.

[10]   State Rec., Vol. 11 (Tab 3), State's Response to Bickham's PCR Application.

[11]   State Rec., Vol. 11 of 14 (Tab 4), Order denying PCR.

[12]   State Rec., Vol. 12 of 14, *see also State v. Bickham*, 2019 KW 1645, 2020 WL

application without stated reasons.[13]   On September 27, 2021, the Louisiana Supreme Court denied relief finding "no lower court error."[14]

In November 2021, Bickham submitted this federal application for habeas corpus relief.[15]   He set forth five claims for relief:   (1) the evidence was legally insufficient to convict him and the trial court failed to instruct the jury on relevant drug-testing law and requirements, which deprived him of his right to due process and an informed, fair and legally sufficient jury verdict; (2) the trial court improperly suppressed evidence and denied him due process and a fair trial and the ability to present a defense by making improper evidentiary rulings limiting or restricting defense evidence; (3) prosecutorial misconduct involving the existence of undisclosed deals with state witnesses and improper inducements violated his right to due process; and (4) prosecutorial misconduct in obtaining, reviewing and using defense counsel's defense work product denied him a fair trial.   He sets forth a fifth claim that the corrupt and coercive case built against him supports his theory that there was an underlying plot by Gauthier to obtain custody of N.B.   To the extent this fifth claim touches on sufficiency of the evidence to convict him, it will be addressed with his first claim

---

1034218 (La. App. 1 Cir. March 3, 2020).

[13]  State Rec., Vol. 13 of 14, *see also State v. Bickham*, 2020 KW 0535, 2020 WL 5518707 (La. App. 1 Cir. Sept. 14, 2020).

[14]  State Rec., Vol. 14 of 14; *see also State v. Bickham*, 2021-KH-00111 (La. 2021), 324 So.3d 81.

[15]  Rec. Doc. 6, Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus.

for relief.    The State does not challenge timeliness or the exhaustion of available state-court

remedies.[16]    The State argues that the claims do not warrant relief and that several of the

claims are also procedurally defaulted.    Bickham has filed a reply to the State's response.[17]

## Facts

On direct appeal, the Louisiana First Circuit Court of Appeal briefly summarized the

facts adduced at trial:

> The defendant and his girlfriend, Kayla Gregg, lived in a small, two-bedroom
> home on 8th Street in Slidell. Kayla had a seventeen-month-old daughter
> named N.B.[18]  Both the defendant and Kayla were drug addicts, who smoked
> crack cocaine often. Lisa Gauthier was a friend of Kayla, who gave the
> defendant and Kayla money and helped take care of N.B.
>
> On May 1, 2014, the defendant called Lisa at home and told her that N.B. was
> sick with a fever. At this point, Kayla was no longer living with the defendant.
> According to Lisa, Kayla would not come home until the defendant treated his
> drug problem. Lisa picked up N.B. at the defendant's house and brought her
> home (to Lisa's house). A short time later at Lisa's house, N.B. began seizing.
> Lisa and her daughter, Marilyn Tapia, took N.B. to the emergency room at
> Ochsner Hospital in Slidell. A urine toxicology screen revealed that N.B. had
> cocaine in her system. N.B. was admitted and kept under observation for the
> next eighteen hours. She was not given any medication for the cocaine and was
> discharged the next day.
>
> Kelvin Rushing, who smoked crack cocaine with the defendant and
> manufactured the drug at the defendant's house in Slidell, testified at trial that
> he had known the defendant and his family all of his life. According to Kelvin,
> he and the defendant were in jail together in 2015. During their incarceration
> together, the defendant told Kelvin that when he was alone at home with N.B.

---

[16]   Rec. Doc. 14, State's Response, p. 13.

[17]   Rec. Doc. 16, Traverse in Opposition to State's Response.

[18]   Minors are referred to by their initials. See La. R.S. 46:1844(W).

and smoking crack cocaine, he would blow the smoke in her face to stop her from crying.

The defendant did not testify at trial.[19]

As an aside, the state-court record shows, and no one disputes, that from its inception, the case investigation was admittedly mishandled.[20]    The original detective assigned to the case neglected it and no investigation was conducted for more than a year.    After that lengthy delay, the case was ultimately reassigned to a detective who had a past undisclosed extramarital affair and lengthy close relationship with the State's key witness.    As a result, the State hired an investigator, Judith Kovacevich, with the District Attorney's Office to independently investigate the facts of the case.    The State filed a lengthy notice of disclosures furnishing the defense with unexpected information involving the investigation, witnesses and defense counsel that the prosecution was made aware of during the proceedings.[21]    Defense counsel, Brian Dragon, who tried the case with Nick Noriea, Jr., denied any alleged impropriety.    Bickham waived all potential conflicts of interest with Dragon and chose to proceed with the representation.[22]    The inappropriate relationship between the lead detective and key witness was disclosed after the police investigation was

---

[19] *State v. Bickham*, 2017 KA 1308, 2018 WL 947095, at *1 (La. App. 1 Cir. 2018) (footnote in original).

[20] Rec. Doc. 14, State's Response, p. 5.

[21] State Rec., Vol. 1 of 14, R.p. 138.

[22] State Rec., Vol. 2 of 14 (Hearing on September 20, 2016), R.p. 324-29.

completed, but before trial.    Bickham evidently sought to report the unethical case investigation (evidenced by Gauthier's taped conversations with Detective Irwin contained on a flash drive in defense counsel's possession).    Bickham requested his file from defense counsel, who provided the entire file, including his own work product, which Bickham gave to the "Concerned Citizens of St. Tammany Parish," who in turn provided it to the Slidell Police Department, who then provided it to the St. Tammany Parish District Attorney's Office.

**Standards of Review on the Merits**

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both.    A state court's purely factual determinations are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."    28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").    With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state-court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). "[E]ven a strong case for relief does not mean the state

court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Id.* (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Analysis

As a preliminary matter, the Court rejects the State's claim that Bickham's state post-conviction claims for relief are procedurally defaulted and barred from federal habeas review.    Here, the State recognizes the general rule that "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on the procedural bar."    Rec. Doc. 14, p. 15 n. 17 (citing *Harris v. Reed*, 489 U.S. 255, 263 (1989)). The State asserts that when the last state-court judgment is a summary affirmance of a lower court judgment denying relief, the federal habeas court may still "look through" to the last reasoned state-court judgment rejecting the federal claim and apply a presumption that later unexplained orders upholding the judgment or rejecting the same claim rested upon the same ground.    *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 802-804 & n. 3 (1991)).

The State applies these straightforward rules of law in a novel manner, arguing that the Louisiana Supreme Court's writ ruling in this case, "Denied. Applicant shows no lower court error," is a summary affirmance.     The Louisiana First Circuit Court of Appeal's ruling denied relief without stated reasons.     The state district court denied relief, reasoning:

> Defendant filed an Application for Post-Conviction Relief on May 15, 2019. The Court requested a Response from the Office of the District Attorney which was received by the Court on October 22, 2019.     Following review of the Response by the Office of the District Attorney and for the Reasons asserted therein, the Application for Post-Conviction Relief is denied.

Thus, the State contends that we must apply the "look-through" doctrine, essentially to the reasons cited in the District Attorney's Response in opposition to Petitioner's state district court application for post-conviction relief, as adopted by the state district court.     And the District Attorney's response below asserted state procedural grounds under Louisiana Code of Criminal Procedure article 930.4 subsections (A), (B) and (C), for denying Bickham's claims for relief, and separately addressed his *Brady* claims and ineffective assistance claims on the merits.     Therefore, the State concludes, the last-reasoned decision by the state district court mirrored the State's response and applied the procedural bar grounds cited by the State to deny the claims Bickham raised for the first time on state post-conviction review.

The State's arguments for procedural default in this case conflict with the Supreme Court's clear edicts cited above in *Ylst v. Nunnemaker* and *Harris v. Reed*.     Federal law requires that the last state court rendering a judgment in the case clearly and expressly state that its judgment rests on the procedural bar.     Here, not a single court cited a state

procedural rule as grounds for denying relief.    Federal law also requires a federal court look to the last reasoned state-court judgment rejecting the federal claim.    Here, the State asks us instead to look through to an opposition filed in the state district court.    The Court declines to engage in a convoluted analysis unsupported by federal law that would require looking through state-court judgments to a response in opposition filed in a state post-conviction proceeding for the purpose of finding and applying state procedural bars to reject a petitioner's federal habeas claims as procedurally defaulted.    Instead, the Court will consider the State's alternate arguments for rejecting Bickham's claims on the merits.

<em>Claim One</em>: <em>Sufficiency of the Evidence and Omitted Jury Instruction</em>

Bickham asserts that the evidence presented by the State was insufficient to convict him of second-degree cruelty to a juvenile (count one) or cruelty to a juvenile (count two). The state courts rejected this claim on the merits on direct appeal.    In denying the claim, the court of appeal reasoned:

> In his first counseled assignment of error, the defendant argues the evidence was insufficient to support the convictions. Specifically, the defendant contends that the testimonial evidence was not credible; and he further contends that the State did not prove that N.B. suffered serious bodily injury or neurological impairment following the incident.

> A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See* La. C. Cr. P. art. 821(B); *State v. Ordodi*, 06–0207, p. 10 (La. 11/29/06), 946 So. 2d 654, 660; *State v. Mussall*, 523 So.

12

2d 1305, 1308–09 (La. 1988). The *Jackson* standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. *See State v. Patorno*, 01–2585, p. 5 (La. App. 1st Cir. 6/21/02), 822 So. 2d 141, 144.

La. R.S. 14:93 provides in pertinent part:

> A. Cruelty to juveniles is:
> * * * * *
> (3) The intentional or criminally negligent allowing of any child under the age of seventeen years by any person over the age of seventeen years to be present during the manufacturing, distribution, or purchasing or attempted manufacturing, distribution, or purchasing of a controlled dangerous substance in violation of the Uniform Controlled Dangerous Substances Law. Lack of knowledge of the child's age shall not be a defense.

La. R.S. 14:93.2.3 provides in pertinent part:

> A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

> (2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

The term "intentional" as used in La. R.S. 14:93 refers to general criminal intent to mistreat or neglect and does not require an intent to cause the child unjustifiable pain and suffering. *State v. Booker*, 02–1269, p. 5 (La. App. 1st Cir. 2/14/03), 839 So. 2d 455, 459, *writ denied*, 03–1145 (La. 10/31/03), 857 So. 2d 476. General intent requires a showing that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2). In general intent crimes, the criminal intent necessary to sustain

a conviction is shown by the very doing of the acts which have been declared criminal. *State v. Howard*, 94–0023, p. 3 (La. 6/3/94), 638 So. 2d 216, 217 (per curiam). Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under the circumstances. La. R.S. 14:12.

In his brief, the defendant suggests this case was "riddled with conflicts of interests" and "self-dealing." The defendant points out that Lisa Gauthier was involved in an extramarital affair with Sergeant Luke Irwin, who was later assigned to lead the investigation in this case. The defendant suggests that Lisa determined on her own that he (the defendant) was unfit to care for N.B. and sought to get N.B. away from him. The defendant further avers that Kelvin Rushing was "willing to sacrifice the truth for the purpose of receiving some form of leniency from the State." The defendant also avers that Kayla Gregg, N.B.'s biological mother, lacked any credibility because she was a "drug-addicted prostitute."

According to the defendant, while he did have a drug addiction, there was also evidence to suggest that Kayla, Kelvin, and other fact witnesses contributed to N.B.'s condition. The evidence was not sufficiently clear, the defendant avers, that it was only him, to the exclusion of these others, who caused N.B. to have cocaine in her system the day she was brought to the hospital. Moreover, according to the defendant, the State failed to show N.B. suffered serious bodily injury or neurological impairment following "the incident." The defendant notes that since cocaine metabolizes extremely fast, the emergency room physician's protocol was "simply to observe [N.B.] and make sure all of her vitals were good." N.B. was "in good spirits and visibly happy," according to the defendant. N.B. was not prescribed any medication, the defendant points out, and there was no permanent damage to her lungs or to any of her organs. The defendant's attempts to minimize his involvement notwithstanding, there was ample evidence to establish that he consistently jeopardized the health and well-being of N.B. The testimony at trial established that the defendant had custody of N.B. and was the sole provider and caretaker of the seventeen-month-old toddler, particularly during the almost two-month period before N.B. was taken to the hospital. It was during this period that Kayla Gregg had left the defendant, in part it appears, because he would not stop using drugs. The defendant was a crack cocaine addict. He and several people routinely smoked crack cocaine at his house while N.B. was present. In addition, several

people, including the defendant's nephews, regularly "cooked," or manufactured crack cocaine at the defendant's house while N.B. was at the house.

On May 1, 2014, N.B. was brought to the hospital, where cocaine was found in her system. The defendant sent a sample of his urine to a toxicology lab in Redwood, California. The defendant's specimen was collected on May 20, 2014, and it tested positive for Benzoylecgonine BE, which is a cocaine metabolite. It appears, thus, that even after N.B. was taken to the hospital, the defendant continued to smoke crack cocaine.

Lisa indicated at trial that she had felony convictions, including for theft over $500 (food stamp fraud). According to Lisa, when she (Lisa) had provisional custody of N.B., she took N.B. to the Crawfish Cook-off (a festival) in Slidell on April 26, 2014. The defendant wanted N.B. back, so Lisa returned her after the festival. Five days later (May 1, 2014), the defendant called Lisa and told her N.B. was sick, with a fever. Lisa testified she got to the defendant's house, and that it was very messy. She saw what appeared to be crack cocaine and powder cocaine on the table. Lisa also noticed that N.B. was in the same onesie that she (Lisa) had dressed her in five days before for the festival. According to Lisa, N.B. was dirty, and there was nothing at the defendant's house for a baby.

On this day (May 1, 2014), after Lisa had taken N.B. to her house, N.B. began seizing. According to Lisa, she called the defendant, told him that N.B. had had a seizure, and that she was taking her to the hospital. The defendant told Lisa she had no right to take N.B. to the hospital. Lisa hung up on the defendant, called Kayla, and told her she was taking N.B. to the hospital. According to Lisa, as she was sitting with N.B. in the ER triage, the defendant rushed into the hospital and said: "You had no right taking my f–––ing daughter to the hospital, bitch. I'm going to f–––ing kill you if I lose my daughter." The defendant tried to take N.B., but Lisa stopped him. Lisa explained to the triage nurse that the defendant was N.B.'s father, but she (Lisa) had provisional custody by mandate, and that N.B.'s mother said that she wanted her daughter to be seen. Security was called, and Lisa and N.B. were taken to the back. According to Lisa, the defendant was still screaming, "Bitch, you are dead." Kayla also showed up at the hospital. According to Lisa, Kayla stayed with them until the Slidell police went in to interview them. Lisa testified that, at this point, Kayla said she had to go to the bathroom, and told Lisa while pointing to her purse, "I'm holding." Kayla went to the bathroom and never returned.

Kayla Gregg testified that she and the defendant smoked crack cocaine while N.B. was at home with them. According to Kayla, she and the defendant collected scrap metal to sell for money to buy drugs. Kayla identified three of the defendant's nephews and testified they come over to their (her and the defendant's) house to manufacture crack cocaine. The nephews would then sell the drugs. Kayla stated the defendant had the ingredients in the house to "cook" the crack cocaine, such as baking soda and Pyrex measuring glassware. When Kayla was still living with the defendant, she would take N.B. out of the house when the defendant's relatives came over to manufacture crack cocaine. Kayla indicated that the nephews would pay the defendant in crack cocaine in exchange for allowing them to use his house. According to Kayla, the defendant's nephews manufactured crack cocaine at his house once or twice a month. When the defendant and Kayla smoked crack cocaine, N.B. was at the two-bedroom house, but in another room. Other people smoked crack cocaine with them, as well, such as Ashley Mason (Kayla's best friend) and a couple of "guys" the defendant knew from the neighborhood. After Kayla left the defendant, she became involved with Kelvin Rushing. According to Kayla, Kelvin was a crack cocaine dealer, and he sold powder cocaine, as well. In the instant matter, Kayla pled guilty to child desertion.

Ashley Mason testified that she sometimes went to the defendant's house (when Kayla was not there) to help out with N.B. According to Ashley, she and the defendant smoked crack cocaine at his house, but not around N.B. Ashley stated that N.B. was sleeping when they did drugs. Ashley explained that while N.B. slept, they would leave her door "cracked" open. According to Ashley, after Kayla left the defendant, the defendant's use of crack cocaine increased. Kelvin Rushing, a well-known drug dealer in the Slidell area and career offender, testified at trial that he knew the defendant and his family his whole life. According to Kayla, Kelvin was also a pimp. Kelvin indicated that he and the defendant were never friends, and that he was closer with the defendant's brother. Kelvin was in jail when he testified in this case; he made it clear, however, that he had no deals with the State and he had been promised nothing in exchange for his testimony. After Kayla left the defendant, she began hanging out with Kelvin, who supplied her with drugs. Kelvin and Kayla eventually became involved in a relationship. According to Kelvin, he and the defendant were in jail together in 2015. At that time, the defendant told Kelvin that sometimes when he (the defendant) had been home alone with N.B., and he was getting high and N.B. was crying, he would blow the smoke from the crack cocaine at N.B., and it would calm her down. Kelvin testified that he would go to the defendant's house and they would get "high" together. Kelvin

also used the defendant's house to cook and cut crack cocaine. Kayla had left by this time, but N.B. was still in the defendant's house. According to Kelvin, when he (Kelvin) was cooking cocaine, he would have some females there to help with N.B. and to keep her "out of the mix." They would put N.B. in another room but, according to Kelvin, "there were times that the baby would venture back into the area where we was at." Kelvin explained that all of the adults, including the defendant, would get high on crack cocaine during this time. When asked how often he cooked cocaine, Kelvin testified that it was a daily routine for him to stop by the defendant's house. Kelvin testified that, besides N.B., he had never seen another child at the defendant's house. When asked if he would have brought another child over there, Kelvin testified that "during this time it wasn't an atmosphere for a child. I was running out of there, a known drug dealer, his nephew, other crack smokers. I mean, it just wasn't the atmosphere for a child[.]"

Marshae Navarre testified at trial that she was an ex-girlfriend of Kelvin Rushing, and that she knew the defendant and Kayla. Marshae described a night when she went to the defendant's house and she, Kelvin, Kayla, and defendant "got high" on crack cocaine. N.B. was there, but asleep in another room. Marshae indicated there were other times when she went to the defendant's house, and the defendant was "high." Marshae testified that she did not like the defendant and thought he was a "woman beater." When asked if she would bring her own child to the defendant's house, Marshae replied that she would not because "it's too much drug activity in that house, and I would not put my son around nothing like that."

Based on all of the foregoing testimony, if believed, a rational juror could have concluded that the defendant was guilty of cruelty to a juvenile and second degree cruelty to a juvenile. In particular, the testimony clearly established that the defendant allowed a child to be present during the manufacturing of a controlled dangerous substance. See La. R.S. 14:93(A)(3).

A rational juror could also have concluded that the defendant, either through intentional or criminally negligent treatment, or neglect, caused neurological impairment of N.B. or subjected her to substantial risk of death. See La. R.S. 14:93.2.3(A). While the defendant suggests in brief that N.B. was fine when she left the hospital, and that there was no permanent damage to her lungs or organs, N.B.'s ostensible healthy status as she left the care of medical professionals is not determinative of whether the elements of this offense have been met. Dr. Lee Domangue, the emergency room physician who treated N.B.,

testified that he had been told by the people who brought N.B. to the hospital that N.B. had suffered a seizure or seizures at home. N.B. was tachycardic (rapid heart rate) and slightly hypertensive. A toxicology screen of her urine revealed she had cocaine in her system. The amount of cocaine could not be determined from the test, but only that there was cocaine in her system. According to Dr. Domangue, the threshold quantity to determine the presence of cocaine in the system is 300 nanograms per millimeter, which is the threshold quantity used for an adult or child. Dr. Domangue explained that because cocaine metabolizes so rapidly, the byproduct (metabolite) stays in the body for only twenty-four to seventy-two hours. Dr. Domangue placed N.B. in the Pediatric Intensive Care Unit (PICU), where she could be observed over the next several hours. Dr. Domangue explained that N.B. was not given any medication because there is no antidote for a child who ingests cocaine; the treatment, rather, consists of observation unless something went wrong with a specific system which required intervention. N.B. was discharged from the hospital about eighteen hours later. Dr. Domangue made clear that he admitted N.B. to the PICU because he believed that N.B.'s life was in danger. When asked if cocaine in the system of a seventeen-month-old toddler would be considered an overdose, the doctor replied that, "Any amount of cocaine in a child is abnormal, it should not be there. Whether it's an overdose or a toxic dose or an illegal dose is irrelevant, I think." On redirect examination, the following exchange took place:

Q. And are certain people's make-up generally cause them to react differentially [sic] to cocaine regardless of the amount in your experience?

A. It could.

Q. Okay. And due to the different ways in which people react, can people react in your experience in a way which is fatal to them by ingesting cocaine?

A. Absolutely.

Q. And due to that concern, is that why you admitted the patient to the PICU for monitoring purposes?

A. Yes.

Further, it was clear that N.B. had developmental issues. According to Marilyn Tapia, Lisa's daughter, N.B. was very developmentally behind. In comparing N.B. to her seven-month-old child, Marilyn testified:

> My seven-month-old daughter knew what feeding food was to grab off a table, little Gerber bites to put them in her mouth and to eat them. [N.B.] did not. [N.B.] didn't know how to be spoon fed. She didn't know what it was. She would spit it out the moment that you even tried putting it to her lips.

> I would put her next to my baby and try to show her and she didn't want to do it. She would spit it out. But if you gave [N.B.] a bottle, she would take it, but she would not hold it herself. She didn't know how to do so.

> [N.B.] didn't know how to crawl, she didn't know how to walk. My daughter was seven months old and was already crawling and beginning to start walking.

Kayla, too, testified that N.B. had developmental issues. At fourteen or fifteen months old, N.B. could only crawl. According to Kayla, a case worker from First Steps came over to the house to help Kayla with N.B. They would do activities together, and the case worker would teach N.B. how to reach for toys and to crawl for things.

Moreover, as the State points out in its brief, both Lisa and Marilyn indicated that N.B. had a seizure before she was taken to the emergency room. A rational trier of fact, the State avers, could have concluded that a seizure constitutes "neurological impairment." See La. R.S. 14:93.2.3(A)(1).

Based on the foregoing testimonial evidence of several witnesses, a trier of fact could have reasonably concluded that the defendant committed the crimes of cruelty and second degree cruelty to juveniles. All of the other issues raised by the defendant in brief involved credibility determinations. These issues raised by the defendant were all brought out at trial and it was left to the jury to determine the veracity of each witness. Thus, whereas the defendant suggests that Lisa Gauthier wanted custody of N.B. and would do what she needed to do to get N.B. away from the defendant, the testimony suggested otherwise. The record does not indicate that Lisa ever sought to seize or take away the custody of N.B. from Kayla or the defendant. Lisa recognized the deleterious environment that N.B. was in, and only wanted N.B. to be provided with a

better living arrangement. Lisa and the defendant agreed that Lisa would have provisional custody of N.B. and signed an agreement to that effect. Lisa required this agreement so that she could, as her guardian, enroll N.B. in school and take her to doctors. The defendant was not the biological father of N.B. At present, neither Lisa, nor the defendant, nor Kayla has custody of N.B.; N.B. has been placed with a foster care family. Lisa testified that there was never any plan, on her own or with Kayla, to take N.B. away from the defendant. Lisa explained that she did what the defendant had asked her to do, which was to take care of N.B. while the defendant was in rehabilitation (for drug use).

The defendant suggests in brief that Lisa used her affair with Sergeant Luke Irwin, with the Slidell Police Department, to help her get N.B. from the defendant. Both Lisa and Sergeant Irwin, however, admitted to their indiscretions, but their affair had begun and ended long before the instant incident when N.B. was taken to the hospital. Further, according to Lisa, when she spoke with Sergeant Irwin after he took over N.B.'s case, their conversations had nothing to do with the case. Sergeant Irwin admitted his wrongdoing in taking over the case without informing his supervisor that he had been sexually involved with a witness from the case. Sergeant Irwin did not get assigned the case until over a year after the incident at the hospital occurred. Sergeant Irwin testified that he had known Lisa since 2010, that they had sexual relations for a short time, and that the affair ended well before this case. Sergeant Irwin made clear that the extent of his involvement with this case was that he and the police officer who assisted him on the case, Detective Nicholas Knight, with the Slidell Police Department, obtained medical records and documents, and conducted interviews of witnesses, all of which were recorded. Sergeant Irwin stated that he never had conversations with Lisa about helping her get N.B. He did admit that he told Lisa he would help her move because Lisa was scared of Brian Dragon, defense counsel, and of the defendant and his family. According to Sergeant Irwin, Lisa wanted to leave Slidell and change her name. Lisa testified that Sergeant Irwin had not done anything to persuade her in this case; and that their conversations had nothing to do with the case. Lisa further stated that Sergeant Irwin "did not guide [her] in this [N.B.] situation at all."

The defendant in brief suggests that Kelvin lied in his testimony in order to curry favor with the State. But Kelvin readily admitted that he was a drug dealer, that he was in jail much of the time, and that he was always talking to people outside of jail that could possibly help him with whatever case/crime he was in for. Regarding any plea deal, the following exchange on direct

examination took place:

> Q. As you sit here, though, I'm assuming, of course, you hope that someone would look and see that you would testify and evaluate the testimony, that you would hope to get some type of consideration; is that not correct?

> A. Yes, sir. I wouldn't be human if I wouldn't hope that someone would look and give me some type of consideration for making such a stand.

> Q. And you've asked, haven't you?

> A. Yes, I have, several times.

> Q. And you've been told what by me and Mr. Macke?

> A. That no promises would be made.

On Kelvin's redirect examination, the following exchange took place:

> Q. Okay. As you are sitting here right now and testifying to these ladies and gentlemen sitting right here, are you just saying whatever in the world the State of Louisiana wants you to say in the hopes that Mr. Macke and myself look favorably on you?

> A. No. One thing you've made clear from the very beginning is you weren't promising me anything. In fact, you told me I didn't have to testify at all. So it's not about, at the end of the day, it's not even about the State of Louisiana. It's about me and me feeling that I've done the right thing.

> Q. What did I tell you would happen if you lied on the stand, whether it helped the State of Louisiana or hurt the State of Louisiana?

> A. Told me you would charge me.

Finally, the defendant suggested in brief that besides just him, there were others around, namely Kayla, Kelvin, and Lisa, who may have contributed to N.B. having cocaine in her system. The testimony, however, suggested otherwise. That is, N.B. was in the care and custody of the defendant on the

day she became sick and was taken to the hospital. The testimony of Kayla, Kelvin, and Lisa, along with the corroborative testimony of the District Attorney's own investigator, revealed that these three people were not at the defendant's house the day N.B. got cocaine in her system and became sick. Lisa, of course, was at the defendant's house later that day, but only after N.B. had gotten sick, and the defendant called her to come over to help with N.B.

Whether or not any of the witness testimony was persuasive, which established the defendant's guilt, was a credibility call made by the jury. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfinder's determination of guilt. *State v. Taylor*, 97–2261, p. 6 (La. App. 1st Cir. 9/25/98), 721 So. 2d 929, 932. We are constitutionally precluded from acting as a "thirteenth juror" in assessing what weight to give evidence in criminal cases. *See State v. Mitchell*, 99–3342, p. 8 (La. 10/17/00), 772 So. 2d 78, 83. The fact that the record contains evidence which conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. *State v. Quinn*, 479 So. 2d 592, 596 (La. App. 1st Cir. 1985). *See also State v. Weary*, 03–3067 p. 20 (La. 4/24/06), 931 So. 2d 297, 312, *cert. denied*, 549 U.S. 1062, 127 S. Ct. 682, 166 L.Ed.2d 531 (2006).

When a case involves circumstantial evidence and the trier of fact reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. *State v. Moten*, 510 So. 2d 55, 61 (La. App. 1st Cir.), *writ denied*, 514 So. 2d 126 (La. 1987). In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Higgins*, 03–1980, p. 6 (La. 4/1/05), 898 So. 2d 1219, 1226, *cert. denied*, 546 U.S. 883, 126 S. Ct. 182, 163 L.Ed.2d 187 (2005). The jury's verdicts reflected the reasonable conclusion that, based on the documentary evidence and the testimony of several witnesses, particularly of Lisa Gauthier, Kelvin Rushing, and Dr. Domangue, the defendant was guilty as charged on both counts. In finding the defendant guilty, the jury clearly rejected the defendant's theory of innocence. *See Moten*, 510 So. 2d at 61.

After a thorough review of the record, we find the evidence supports the jury's verdicts. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of cruelty to juveniles and second degree cruelty to juveniles. *See State v. Calloway*, 07–2306, pp. 1–2 (La. 1/21/09), 1 So. 3d 417, 418 (per curiam).

This counseled assignment of error is without merit.[23]

The Louisiana Supreme Court subsequently denied relief without additional stated reasons.

The Louisiana First Circuit properly analyzed the claim using the *Jackson v. Virginia* standard, which requires a determination regarding whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.[24]    *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Williams v. Cain*, 408 F. Appx. 817, 821 (5th Cir. 2011); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008).    Review of the sufficiency of the evidence does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury.    *United States v. Young*,

---

[23]    *State v. Bickham*, 2017-KA-1308, 2018 WL 947095, at *1-9 (footnotes in original). Bickham's *pro se* assignment of error concerning the sufficiency of the evidence was denied because it had been raised by appellate counsel and thoroughly addressed and rejected as meritless in the first counseled assignment of error.

[24]    Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal habeas corpus proceedings; only the *Jackson* standard need be satisfied, even if state law would impose a more demanding standard of proof.    *Foy v. Donnelly*, 959 F.2d 1307, 1314 n. 9 (5th Cir. 1992).

107 F. Appx. 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").   Thus, all credibility choices and conflicting inferences must be resolved in favor of the verdict.   *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

A federal habeas court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder.   *Weeks v. Scott*, 55 F.3d 1059, 1062 (5th Cir. 1995); *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985). In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' "   *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis added)).

Here, the court of appeal concluded that the evidence was sufficient for the jury to find beyond a reasonable doubt that Bickham was guilty of second degree cruelty to a juvenile and cruelty to a juvenile.   Because a claim challenging the sufficiency of the evidence presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1); *Taylor v. Day*, Civ. Action No. 98–3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), *aff'd*, 213 F.3d 639 (5th Cir.

2000).    Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential."    *Parker v. Matthews*, 567 U.S. 37, 43 (2012); *see also Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

Bickham claims that the State failed to prove the elements required for second-degree cruelty to a juvenile.    He disputes that his neglect or mistreatment resulted in N.B.'s presumptive positive cocaine test or any serious bodily injury or neurological impairment. He argues that there was insufficient proof that N.B. ingested cocaine based on a mere "presumptive positive" drug test, particularly where the jury was unaware of state-law requirements for testing and confirming positive results.    He also contends the State failed to show that N.B. sustained serious bodily injury or neurological impairment because she required no medical treatment besides observation.    He claims the jury should have rejected the State witnesses' testimony due to inconsistencies and coercion.    And although his arguments primarily focus on the insufficient proof of second-degree cruelty, he argues that the insufficient finding of guilt as to that count unfairly influenced the jury and led them to convict him on the count of cruelty to a juvenile.

As set forth by the Louisiana First Circuit, second-degree cruelty to juveniles is defined as:

> A. (1) Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen

to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

(2) For purposes of this Section, "serious bodily injury" means bodily injury involving protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or substantial risk of death.

La. R.S. 14:93.2.3.    Additionally, cruelty to a juvenile is defined, in relevant part, as:

(3) The intentional or criminally negligent allowing of any child under the age of seventeen years by any person over the age of seventeen years to be present during the manufacturing, distribution, or purchasing or attempted manufacturing, distribution, or purchasing of a controlled dangerous substance in violation of the Uniform Controlled Dangerous Substances Law. Lack of knowledge of the child's age shall not be a defense.

La. R.S. 14:93 (A)(3).    As quoted earlier, the state appellate court also discussed the pertinent statutory definitions for general criminal intent and criminal negligence.    For the following reasons, the court of appeal reasonably determined that the State's evidence sufficed to prove the elements of second degree cruelty to a juvenile and cruelty to a juvenile.

First, Bickham contests the weight the jury afforded N.B.'s "presumptive positive" drug test results.    He speculates that a presumptive positive alone, with no confirmation of the result, limits the strength of the evidence against him.    However, the evidence presented at trial shows otherwise, and the jury had the opportunity to consider and weigh the evidence presented.

The State presented the testimony of treating emergency room physician, Dr. Lee

Robert Domangue, and an expert toxicologist, John Martin.[25]   The experts agreed that a urine test like the one administered to N.B. was the "test of choice" because the active metabolite stays in the urine longer than in the bloodstream.[26]   N.B.'s toxicology results from her urine test were conclusive for a cocaine metabolite or byproduct at the threshold level (300 nanograms per milliliter - same for an adult or child) required to determine that cocaine was indeed present in N.B.'s system.   The fact that the threshold quantity was detected meant she was presumptively positive for cocaine.   Furthermore, the presence of the metabolite meant her exposure likely occurred within the last three days when she was in Bickham's care.[27]

In the medical setting, no further testing or confirmation was necessary.   Dr. Domangue explained that "[t]he lab has always determined that in the interest of the accuracy they all preface any positive result with presumptive.   There are some qualitative

---

[25]   John Martin was involved only with the testing of Bickham's May 20, 2014 specimen at Redwood Toxicology Laboratory.   State Rec., Vol. 4 of 14, Trial Transcript, p. 880.   He described generally how some companies only require the screening test or Enzyme Immunoassay (EIA) and some request a confirmation test or Radioimmunoassay (RIA).   The EIA is well-accepted in the scientific community.   *Id.* at 884-86.

[26]   Dr. Domangue explained, "Cocaine is absorbed in the system, the blood stream rapidly, typically.   And then because it is in the bloodstream, it passes through the liver quickly.   Assuming a normal hepatic function or liver function, it's converted into an active metabolite which is ultimately excreted in the urine through the kidneys."   State Rec., Vol. 4 of 14, Trial Transcript, pp. 791-92 (Dr. Domangue); 894 (John Martin).

[27]   State Rec., Vol. 4 of 14, Trial Transcript, pp. 792-94 (Dr. Domangue); pp. 890-94 (John Martin).

tests that do indeed have some cross-reactivity with specific other typically nonillegal substances."[28]    However, the test for cocaine is metabolite specific for cocaine; it does not cross-react with anything else.[29]    On cross-examination, the defense questioned whether it was necessary to confirm a presumptive positive test result.    Defense counsel had Dr. Domangue read the qualification language contained in the lab report, which included the following:

> This report is intended for use in clinical monitoring and management of patients, it is not intended for use in employment-related drug testing. Because of any cross-reactants, positive results on toxicology drug screens should be confirmed whatever results do not correlate with clinical presentation.    Presumptive positive results are unconfirmed and may be used only for medical purposes.[30]

As Dr. Domangue reiterated to defense counsel, further testing beyond the presumptive positive urine test was not necessary to confirm or quantify the results.    He emphatically explained, "It wasn't indicated, it's unnecessary and it wouldn't have led me to do anything differently."[31]

Furthermore, the defense challenged the presumptive positive result through questions regarding the potential for false positives.    The defense even explored the

---

[28]   State Rec., Vol. 4 of 14, Trial Transcript, p. 791.

[29]   *Id.*

[30]   State Rec., Vol. 4 of 14, Trial Transcript, p. 809.

[31]   *Id.* at 809-10.

possibility that a cold medicine or fever reducer given to the child by Gauthier or her daughter, Marilyn, could have resulted in a false positive result, but the witnesses rejected that possibility.    The jury was able to give appropriate weight to the "presumptive positive" test result and conclude that N.B. had a significant threshold level of cocaine in her system.

Second, Bickham argues that the State failed to prove N.B. suffered any serious bodily injury, as defined by statute, or neurological impairment.    He contends that her hospital stay was brief, and she was merely monitored and released, appearing healthy and normal with no lasting effects from the cocaine.    He notes that tests did not reveal any seizure activity and she had no fever while at the hospital although these symptoms were reported by Gauthier and her daughter.

The state appellate court rejected the argument on direct appeal finding that the State presented sufficient evidence at trial to prove this statutory element.    Dr. Domangue testified that N.B. exhibited signs of a rapid heart rate and was slightly hypertensive for her age, with reports of previous seizure activity and fever.[32]    She had ingested cocaine as revealed by her presumptive positive drug screen.    She had to be admitted to the hospital and closely monitored because she was only 17 months old and at risk of multi-system failure and death.[33]    In sum, the evidence showed that N.B. was exposed to cocaine and hospitalized after it was determined she had ingested enough cocaine to produce a

---

[32]   State Rec., Vol. 4 of 14, Trial Transcript, p. 782-83.

[33]   *Id.* at 795, 800-01.

presumptive positive test result and put her life in danger.    The appellate court reasonably concluded that this evidence sufficed to show serious bodily injury involving a substantial risk of death or neurological impairment.

Finally, Bickham points to defense theories that he believes should have been given more weight, such as incredible witnesses, shoddy investigation, false-positive test results, and a plot by Gauthier to get N.B. from Bickham.    He does not dispute that the elements of cruelty to a juvenile were satisfied based on witness testimony that he allowed N.B. to be present during the manufacturing of crack cocaine.    Instead, he contests the credibility of the State's witnesses who all had criminal convictions and admitted to drug addictions. Indeed, throughout his memorandum in support and intertwined with several of his claims for relief, Bickham contests the credibility of virtually every witness who testified for the State.    The witnesses include Lisa Gauthier, Marilyn Tapia, Kayla Gregg, Detective Irwin, Kelvin Rushing, Ashley Mason, and Marshae Navarre.    He argues that Gauthier and her daughter, Marilyn, gave conflicting and inconsistent testimony.    Bickham condemns the investigation and purported incredible testimony by Gauthier and Irwin because Detective Irwin admitted he was involved in an extramarital affair with Gauthier before the investigation started and they remained friends, yet he hid that relationship from his superiors until the investigation was concluded.    Bickham maintains that there was a plot to take N.B. from him and get custody for Gauthier.    He believes that Rushing and other witnesses were involved in this plot and that Rushing testified to benefit himself in a future

sentencing proceeding on a criminal conviction.    Bickham also suggests that Gregg, Mason, and Navarre were not believable witnesses and were coerced to testify.

The appellate court discussed each of these witnesses' testimony when resolving the sufficiency claim.    The jury in this case considered the evidence in its entirety, including the issues raised by Bickham above and elicited by the defense at trial.    Whether to find the witnesses' testimony persuasive or to reject any part or all of it was a credibility call for the jury.[34]    The Court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses.    *Jackson*, 443 U.S. at 319.    To the extent his sufficiency claim is based on arguments concerning witness credibility, a federal habeas court generally will not grant relief.    *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review."); *Davis v. Davis*, 807 F. Appx. 337, 340 (5th Cir. 2020) (upholding denial of habeas relief on a sufficiency-of-the-evidence claim where petitioner challenged the jury's credibility determinations and weighing of the evidence); *Ramirez*, 398 F.3d at 695 ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict.").

When the evidence in this case is viewed in the light most favorable to the

---

[34]    During deliberations, the jury asked for the definitions and elements of the charges to be read again.    State Rec., Vol. 1 of 14, R.p. 225.    The 10-2 jury verdict on the count of second-degree cruelty indicates that some jurors indeed weighed the evidence differently. State Rec., Vol. 1 of 14, R.p. 44.

prosecution, it simply cannot be said that the guilty verdict was irrational.    Bickham cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Furthermore, to the extent Bickham claims that the unconstitutional jury verdicts resulted from trial court error in not instructing jurors on drug testing requirements, including proper confirmation of test results, the claim does not warrant habeas relief.    His purely state-law claim that the trial court failed to follow Louisiana Code of Criminal Procedure article 802, is not cognizable on federal habeas review where a federal court may only determine if a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).    Furthermore, here, the State and the defense agreed on the jury charges to be given at trial.    Defense counsel did not request that the trial court charge the jury about drug testing requirements.    The defense relied on cross-examining the State's expert toxicologist and N.B.'s treating emergency room physician about the toxicology testing and analysis and presumptive positive result.    Dr. Domangue explained the meaning of "presumptive positive" and why no confirmation test was needed in this case.    Under the circumstances, a jury instruction on drug testing under state law, and particularly one under a worker's compensation statute as proposed by Bickham,[35] would not have been proper; it was neither requested nor required.    For the

---

[35] In discussing statutory drug testing requirements, Bickham cites to a Louisiana

reasons stated above, no jury charge such as that suggested by Bickham was warranted. The trial court instructed the jury according to law and as requested by counsel for the State and defense.    Bickham was not denied a fair trial based on the purported omission.

<em>Claim Two</em>: <em>Suppression of Evidence</em>

In this two-part claim for relief concerning the suppression of evidence, Bickham first argues that the trial court suppressed evidence.    Properly construed, that claim for relief is directed at several trial-court rulings, which he argues improperly limited or restricted defense evidence at trial, thereby denying him due process, a fair trial, and the ability to present a complete defense.    He also claims that the prosecution suppressed evidence, which is properly construed as a claim that the State withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).    These claims were summarily denied by the state courts on post-conviction review.

Bickham challenges three trial-court rulings that claims prevented him from exposing "the case corruption of Irwin and Gauthier" and their lack of credibility.[36]    The first ruling involves numerous recorded phone conversations between Lisa Gauthier and Detective Irwin.    After many contested filings on the issue and a pretrial evidentiary hearing, the trial court allowed some, but not all, of the recorded conversations into evidence.    The second

---

Revised Statute involving Labor and Workers' Compensation, La. R.S. 23:1081. Rec. Doc. 6-1, p. 9.

[36]   Rec. Doc. 6-1, pp. 25-27.

pretrial ruling prohibited introduction of Lisa Gauthier's presumptive positive drug test results.   The third ruling occurred during trial and excluded telephone records of phone calls made between Lisa Gauthier and Detective Irwin because they were not properly authenticated.

*Brady* is not implicated because the defense team clearly had knowledge of the evidence before trial and sought to use the evidence as part of its defense at trial.[37] Although disclosed by the prosecution, the evidence was nevertheless contested and either limited or excluded by trial court rulings.   Bickham argues generally that the rulings denied him due process because he was unable to present his case of corruption to the jury or properly challenge the witnesses' credibility.[38]

Bickham is entitled to relief on federal habeas review only if the alleged improper

---

[37]   Bickham's argument centers around the trial court evidentiary rulings, not the disclosure of this evidence.   As to the recordings, Bickham states that "Gauthier herself brought said flash-drive evidence to defense counsel."   Rec. Doc. 6-1, p. 20.   Although limited portions were played, the defense introduced the 17 audiotapes at trial as Defense Exhibit 1.   These were made part of the record exhibits in the state court on direct appeal. State Rec., Vol. 9 of 14.   The defense itself subpoenaed the actual phone records of the calls made between Detective Irwin and Gauthier and attempted to introduce them on direct examination.   And the record confirms that the State disclosed Gauthier's presumptive positive drug test results to the defense before trial.

[38]   On federal habeas review, a federal court does not sit to review the mere admissibility of evidence under state law.   *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998).   Therefore, to the extent Bickham is arguing that the state courts misapplied state evidence law, his claim is not reviewable in this federal proceeding.   *Lucio v. Lumpkin*, 987 F.3d 451, 472 (5th Cir. 2021).   The Court will not reconsider any state-law evidentiary rulings in this section.

exclusion of evidence constituted a denial of fundamental fairness under the Due Process Clause.   *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) ("[A] state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness."); *Woods v. Estelle*, 547 F.2d 269, 271 (5th Cir. 1977).   "Erroneous exclusion of evidence is fundamentally unfair if the evidence was material in the sense that it was crucial, critical, and highly significant."   *Porretto v. Stalder*, 834 F.2d 461, 465 (5th Cir. 1987).

The right of an accused to present a defense has long been recognized as "a fundamental element of due process."   *Washington v. Texas*, 388 U.S. 14, 19 (1967).   "A defendant's right to present a complete defense under the Sixth Amendment is 'an essential attribute' of our criminal justice system but it is not without limits."   *United States v. DeLeon*, 565 F. Appx. 297, 303 (5th Cir. 2014) (citing *United States v. Najera Jimenez*, 593 F.3d 391, 402 (5th Cir. 2010) (internal quotation marks and citation omitted).   Controlling law permits the exclusion of evidence consistent with the constitutional guarantee of a complete defense:

> "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). However, the Constitution also "permits judges to exclude evidence that is ... only marginally relevant or poses an undue risk of ... confusion of the issues." *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (internal quotation and citations omitted).

*United States v. Rodriguez*, 762 F. Appx. 197, 198 (5th Cir. 2019); *see also Caldwell v. Davis*,

757 F. Appx. 336, 339-40 (5th Cir. 2018).    The right to present even relevant evidence may be limited, as the Supreme Court has explained:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Holmes v. South Carolina*, 547 U.S. 319, 326 (2006).    As the Supreme Court has observed, "[o]nly rarely have we held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."    *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (citing *Holmes v. South Carolina*, 547 U.S. at 331 (rule did not rationally serve any discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61 (1987) (rule arbitrary); *Chambers v. Mississippi*, 410 U.S. 284, 302–303 (1973) (State did not even attempt to explain the reason for its rule); *Washington v. Texas*, 388 U.S. at 22 (rule could not be rationally defended)).

Considering controlling federal law, this Court must determine whether the state-court determination is contrary to, or involved an unreasonable application of, Supreme Court precedent.    *Caldwell v. Davis*, 757 F. Appx. at 338-41.    Bickham has made no such showing.

1.   *Trial Court Rulings: Flash drive-phone recordings*

Bickham argues that he should have been allowed to introduce and play the recordings, about two and a half hours total, in their entirety, because they contained case

corruption evidence.[39]    The admissibility of the recordings was considered pretrial on the

State's motion in limine, motion to reconsider the ruling and supplemental motion to

reconsider in part.[40]    The trial court denied the State's motion in limine after a hearing,[41]

but subsequently, upon reconsideration, further refined the ruling with more specifics on

how much evidence the trial court would be willing to allow regarding the relationship

between Gauthier and Irwin.[42]    The trial court recognized that the taped conversations

contained relevant evidence of bias and influence or personal interest due to the intimate

relationship between Gauthier & Detective Irwin.    In fact, the trial court rejected two

aspects sought to be excluded in the State's supplemental motion to reconsider, raised in

paragraphs two and three, involving a request by Detective Irwin for strippers for a bachelor

party and comments he made about helping her disappear if she wanted to move out of

---

[39]  It should be noted that the flash drive at issue here consists of recorded phone
conversations between Gauthier and Irwin.    Although Bickham briefly mentions another
flash drive (Section II at Rec. Doc. 6-1, p. 21), consisting of attorney work product materials,
that evidence is raised in his fourth claim for relief and will be addressed later in this report
and recommendation.

[40]  State Rec., Vol. 1 of 14, Motion in Limine, R.p. 117; Motion to Reconsider, R.p. 148;
Supplemental Motion to Reconsider, R.p. 150; *see also* State Rec., Vol. 2 of 14, Transcript of
Motion in Limine Hearing (September 16, 2016), R.p. 293; Transcript of Motion in Limine,
Motion to Reconsider and Supplement Motion to Reconsider (October 12, 2016), R.p. 393.

[41]  State Rec., Vol. 1 of 14, R.p. 135, Denial of Motion in Limine.

[42]  State Rec., Vol. 1 of 14, R.p. 153, Reasons for Judgment (Supplemental Motion in
Limine).

town. [43]   However, the trial court found that the lengthy recordings also contained additional extraneous details about the sexual relationship or other dealings between the two.   This was referred to as a "trial within a trial type of situation," which the trial court determined would add nothing to the proceedings against Bickham and only serve to waste time and confuse the jury.

The court thoroughly considered the arguments for inclusion and exclusion and issued oral reasons for its decision from the bench, followed by a written order after the hearing.   In oral reasons, the trial court stated:

> I reviewed the tape and specifically the areas that can be gone into.   I denied the motion in limine, but you're not going to introduce two and a half hours worth of tapes.   It's going to have to be those items that are dealing specifically with the case ....
>
> But the corrupt, possible corruption of the case and the bias by the officer, these are matters that can come in; but I'm not going to introduce all of those tapes.   So you get ready for that.[44]

In a subsequent written order, the trial court explained:

> The Court has overruled a prior Motion in Limine that had attempted to exclude evidence concerning a sexual relationship between one of the investigating officers and a witness.   The State now acknowledges the sexual relationship is relevant.   The Court has allowed the defense to go into those matters on various tapes the Court reviewed that relate directly to the investigation of the case and the possible personal interest of the detective in the investigation and prosecution of the case.   The Court also allowed the defendant to use the tapes to show that the two persons were involved in either criminal or totally inappropriate behavior to show the potential that the

---

[43]   State Rec., Vol. 2 of 14, Transcript of Hearing (October 12, 2016), pp. 402-05.

[44]   *Id*. at 405-06.

investigation and prosecution of the case was corrupted by the relationship of the participants. Those tapes indicated totally consensual improper behavior. The defense also wants to show a rape allegation by the witness against the detective totally unrelated to this investigation or prosecution of this case. The purpose is to further impugn the character of the officer. Although conceivably relevant, this creates a situation that the prejudicial impact, confusion of the issues, misleading of the jury (this is a criminal proceeding involving injuries to a child, not a sideshow about loosely alleged crimes by the officer) and amount of time incurred to pursue outweigh any limited probative value. (citations omitted)[45]

On direct appeal, the Louisiana First Circuit addressed the impact the rulings had on the defense when it analyzed Bickham's *pro se* assignment of error alleging ineffective assistance of counsel stemming from the trial court excluding some of the recordings. In denying the claim, the appellate court emphasized how the defense was able to use the recordings effectively at trial. The court reasoned:

The defendant next argues that counsel was "hamstrung by the trial court and thus became ineffective" when it refused the defendant "the right to present his defense" by playing the pertinent parts of the audios relating to conversations that Lisa Gauthier had with Detective Knight, Sergeant Irwin, and Kelvin Rushing. The defendant's assertion here regarding ineffectiveness is meritless.

We note initially that all but one of the taped telephone conversations were between Lisa and Sergeant Irwin. The other conversation was with Detective Knight. There were no recorded conversations with Kelvin. Lisa taped all of these conversations at her home. All of the conversations were transferred to a USB flash drive and designated as defense exhibit D1. Pretrial, the State filed a motion in limine, seeking to exclude the information on the USB flash drive. The trial court, after listening to the conversations, denied the State's motion and found that anything in these conversations that could show corruption or bias was relevant and admissible. The trial court cautioned, however, it was not going to allow defense counsel, Brian Dragon, to introduce two-and-one-

---

[45] State Rec., Vol. 1 of 14, R.p. 153.

half hours of "tapes." The trial court explained that it would be limiting the evidence to those areas that specifically related to the instant crimes. The trial court further ruled that if Sergeant Irwin, on cross-examination, admitted to the information Dragon was seeking to offer, then the recorded conversations pertaining to that information would not be allowed in evidence.

Lisa testified on direct examination that in 2015 or 2016, she began recording her conversations with Sergeant Irwin because she did not trust him. On cross-examination, Dragon questioned Lisa about her recorded phone conversations. His was an exhaustive, comprehensive inquiry, as indicated by the more than one-hundred pages of cross-examination in the trial transcript, much of which centered on Lisa's dealings with Sergeant Irwin. Dragon covered many parts and snippets of Lisa's recorded phone conversations. He would quote a sentence or sentences directly from a conversation, then ask Lisa to explain what it or they meant. When he was not using direct quotes of Lisa or Sergeant Irwin from a recorded phone conversation, he was allowed to play entire recorded calls, as well as parts of other calls. Similarly, on Dragon's direct examination of Sergeant Irwin, Dragon thoroughly questioned him about his involvement and his phone conversations with Lisa.[46]  Parts of the recorded phone conversations were brought to Sergeant Irwin's attention, and Sergeant Irwin was asked to explain what he meant. Accordingly, the defendant has made no showing of ineffective assistance of counsel.[47]

Bickham has not shown that the evidentiary exclusion, even if proven erroneous, played a critically significant role in the context of the entire trial or that it denied him the ability to present his defense.    The trial court ruling, denying the State's motion in limine, allowed the defense to introduce extensive evidence surrounding the improper relationship between Gauthier and Irwin.    In tailoring the ruling, the trial court considered the relevance of the recordings, pursuant to Louisiana Code of Evidence article 403, and weighed

---

[46]  It was direct examination because Dragon in his case-in-chief called Sergeant Irwin as a defense witness.

[47]  *State v. Bickham*, 2018 WL 947095 at *11 (footnote in original).

its probative value against the prejudice, confusion and waste of time that could result from playing all the recorded conversations, especially given the candid admissions by Gauthier and Irwin to the sexual affair.    As the trial transcript reflects, and the appellate court made clear, the trial court ruling allowed the defense liberal use of the recordings to thoroughly examine Gauthier (on cross) and Irwin (on direct) and show potential bias and self-dealing stemming from the secretive inappropriate relationship between a critical prosecution witness and the lead detective; yet it also prevented the jury from hearing superfluous details about their relationship, such as Gauthier's rape allegation where the prejudice outweighed the probative value.

In addition to using the recordings extensively while questioning Gauthier and Irwin to show bias and corruption, the defense was also able to explore possible corruption by questioning Chief Kevin Swann, who assigned the case to Detective Irwin, and learned about the affair after the completed investigation, as well as Detective Nicholas Knight, who was brought into the investigation to assist Detective Irwin and was present for the witness interviews.    The defense questioned numerous witnesses, including Gauthier and Kayla Gregg, about any scheme or plot to get N.B. away from Bickham and give Gauthier custody. Contrary to Bickham's accusation that "the judge is now acting in prosecutorial mode, sacrificing favorable evidence to petitioner to assist the D.A. in securing a conviction— despite the judge-admitted case corruption,"[48]   the trial court's ruling limiting the flash drive

---

[48]   Rec. Doc. 6-1, p. 25.

evidence did not prevent the defense from effectively presenting its theory of corruption and bias surrounding these two witnesses to the jury.   The narrow limitation imposed reasonable restrictions and did not deprive Bickham of a fair trial.

   2.   *Gauthier's drug screen*

   Bickham claims that the trial court improperly denied admission of Gauthier's drug test results and prevented cross-examination about the presumptive positive for methamphetamine.   The trial court granted the State's pretrial motion in limine.[49]   The court determined that the test had little relevance because it took place more than one year before the incident with N.B. when Gauthier was signing up for her probation, and the presumptive positive subsequently came back with confirmation negative from a professional drug testing facility.[50]   Bickham argues that the ruling prevented him from challenging Gauthier's credibility.

   The record shows that damaging credibility evidence about Gauthier was elicited at trial to the extent allowed under state law.   She admitted to a prior theft conviction and her sexual affair with Irwin, which the defense used to cast doubt on her credibility and the investigation of Bickham.   The presumptive positive test results obtained more than a year before N.B.'s incident were immaterial and would have contributed nothing to the defense's case, especially since they were disproven by subsequent testing.   There was no evidence

---

   [49]   State Rec., Vol. 2 of 14, Transcript of Motion in Limine Hearing, pp. 409-12.

   [50]   *State v. Bickham*, 2018 WL 947095 at *13.

adduced at trial to indicate that Gauthier gave N.B. cocaine.     N.B. was in Bickham's sole custody for five days before she became ill and the experts agreed that the window of time for N.B. to have ingested the cocaine was up to 72 hours before she tested positive. Excluding evidence of Gauthier's largely irrelevant presumptive positive test results did not deny Bickham a fair trial or the ability to present a complete defense.

   3.   *Telephone records*

   Bickham argues that he was denied effective cross-examination of Detective Irwin because the trial court refused to allow the phone records into evidence to show the number of times Detective Irwin spoke to Lisa Gauthier between June 1, 2015 and June 1, 2016.[51] He argues that he was denied the ability to show case corruption and Detective Irwin's deception.

   He was not denied cross-examination because the defense called Detective Irwin as part of the defense's case on direct examination.     Defense counsel tried to introduce the phone records when Detective Irwin denied talking to Gauthier on an almost daily basis. Defense counsel asked Detective Irwin if he would be surprised to learn he talked to Gauthier on the phone 360 times in that one-year period.     He admitted it would surprise him.[52] The State objected because the defense had not called a witness from the phone company as a custodian of those records to testify.     The trial court sustained the objection agreeing that

---

[51]   Rec. Doc. 6-1, p. 27.

[52]   State Rec., Vol. 7 of 14, Trial Transcript, pp. 1628-30.

the records were not properly authenticated.[53]

The exclusion of the phone records did not deny him due process or a fair trial.    The trial court ruling complied with state evidentiary law.    Even if they had been erroneously excluded, the records themselves added little to the admissions made by Gauthier and Detective Irwin about their relationship.    The defense thoroughly explored Detective Irwin's conflict due to his past intimate relationship with Gauthier and the fact that he was the lead investigator on the case.    The testimony revealed that the investigation was unethical because Detective Irwin did not tell his superiors about his personal relationship with a key witness.    Gauthier testified that she had known Detective Irwin for six years and that they remained friends even after their affair, which ended well before the incident with N.B.    She made the recordings of their phone conversations, which the jury was allowed to hear, because trust issues had developed with him.    As previously discussed, the phone conversations were advantageous to the defense because they contained discussions that did suggest potential bias or corruption, and those were allowed into evidence for the jury to hear.    The phone records listing the calls themselves and showing a mere log of calls made would have added little to the defense.

4.    *Brady/Newly Discovered Evidence: Denial of Motion for New Trial*

Bickham claims that the trial court erred by denying his motion for a new trial based

---

[53]  The State notes in its response that state law at the time required authentication; the law was since amended to allow business records to be deemed self-authenticating in criminal cases, La. C.E. art. 902 (11).    Rec. Doc. 14, p. 48 n. *

on newly discovered evidence.     Bickham argued that he deserved a new trial because the State withheld Alvin Davis's letter, suppressed evidence about the 10-year sentencing deal with Rushing, as Snyder's affidavit prepared by defense counsel after trial revealed, and failed to disclose the identity of a Department of Child and Family Services investigator.[54] Bickham raised the claim in a *pro se* brief on direct appeal.     In denying the claim, the Louisiana First Circuit reasoned:

> In his fourth pro se assignment of error, the defendant argues the trial court erred in denying his motion for new trial. Specifically, the defendant contends that the State at the motion for new trial hearing, through strong-arm methods, obtained Pete Snyder's recantation; and that the State lied at trial that it had no deals with Kelvin Rushing, when in fact, Kelvin received a ten-year sentence instead of a life sentence as an "eighth time felony offender."

> Pete Snyder testified that, following the trial in the instant matter, he was in jail with Kelvin Rushing. On direct examination by Dragon, Snyder testified that, while in jail together, Snyder believed Kelvin might have told him that he (Kelvin) had sold crack cocaine to Lisa Gauthier. Snyder also testified that Kelvin told him that he (Kelvin) and Lisa were engaged in prostitution; and Kelvin said that Lisa was the cause of N.B. being exposed to crack cocaine. Dragon incorporated these alleged statements made by Kelvin to Snyder into an affidavit. Dragon gave the affidavit to Snyder in jail, and Snyder signed it. Paragraphs 7 and 8 of the affidavit stated the following:

>> 7. That before the trial of Larry Bickham, Kelvin Rushing disclosed to him that he had an unofficial deal with the prosecution for his testimony. Mr. Rushing disclosed that an exact number of years was not promised to him, but it would be around ten years.

>> 8. That Kelvin Rushing disclosed to him after he gave [sic] testified as a

---

[54]   In addition to the motion for new trial, the defense filed a supplemental motion for new trial and response to the State's opposition.     State Rec., Vol. 1 of 14, R.p. 231, Motion for New Trial; State Rec., Vol. 2 of 14, R.p. 258, Supplemental Motion for New Trial and Response to State's Opposition.

State's witness that he did so only so he could obtain a sentence less than a life sentence.

When Snyder was asked on direct examination about the truthfulness of the statements in the affidavit, he tended to retract his earlier testimony, indicating that he was not sure what the truth was. Following is the relevant exchange between Dragon and Snyder regarding the contents of the affidavit:

Q. Did he disclose that he had an unofficial deal with the prosecution that if he testified, he will receive a lenient sentence?

A. Well, he said he was hoping to get a better deal at that point. That's where it stopped at that point.

Q. After he testified, did he state to you that he gave that testimony only so he can obtain a sentence less than a life sentence?

A. No.

Q. Well, let me show you this document again. Can you please read paragraphs 7 and 8?

A. (Witness complies.)

Q. Just read it to yourself.

A. That's not exactly the way it was said, but.

Q. Did he ever indicate that the purpose of his testimony was to benefit himself and receive a lesser sentence?

A. No.

Q. Did he ever disclose that he fabricated his testimony?

A. Here's the thing: He never disclosed that he fabricated it, but he told me things. And then after me getting into the other dorm and listening to other people that knew Larry Bickham and Kelvin Rushing, it wasn't exactly the way that it was told.

So that's why I wrote that letter in March stating that I didn't know what the truth was anymore. Because, honestly, everything, it seemed like everything is a lie in here, you know.

* * * * *

Q. Okay. Now, sir, in part of this affidavit it states that Mr. Rushing disclosed that Larry Bickham did not manufacture crack cocaine at his house, that Mr. Rushing disclosed that to you, is that accurate?

A. No, it's not. Because I was told—I was told by, by other gentlemen that's actually—

Q. Sir, I'm asking you what—

A. No, no.

Q. Did Mr. Rushing ever tell you that?

A. No.

Q. Did Mr. Rushing ever disclose that he never witnessed Mr. Bickham smoking crack cocaine in front of his daughter?

A. No, he did not.

Q. Did Mr. Rushing ever disclose that a young lady by the name of Ms. Navarre worked as a prostitute for him?

A. He did.

Q. Did Mr. Rushing disclose that he did not have any dealings with Mr. Bickham after Kelvin and Kayla started a relationship?

A. No. That was a mistake on my part. Actually, actually, it was written down on there, but I misunderstood what was on there, though.

On cross-examination by the prosecutor at the motion for new trial hearing, Snyder testified that he neither typed the affidavit nor told Dragon what to put in the affidavit. When Dragon met Snyder in jail, Dragon let him read the

document. Snyder indicated that a "bunch" of the lines in the affidavit were not accurate. Snyder indicated that Kelvin never told him that he was getting a deal with the prosecution for a reduced sentence; and further that, despite it being in the affidavit (in paragraph 9), Kelvin never told Snyder that he fabricated his entire testimony to obtain a deal with the State. Snyder also testified that the information in paragraph 10 of the affidavit was not accurate. The paragraph indicated that Kelvin had said the defendant did not manufacture or distribute crack cocaine from his residence. Paragraph 11 of the affidavit stated that Kelvin disclosed that he never witnessed the defendant smoke crack cocaine in front of the minor child. Snyder indicated that Paragraph 11 also was not true.

On cross-examination, Snyder again revealed his reservations about the contents of the affidavit because the truth of the matter could not be discerned, given the environment he was in:

> When I signed the—I sent the—the letter I sent to Mr. Dragon stating some of the concerns I had, some of the reasons why I didn't want to testify today, you know, because of, because of the information that I've learned over the last couple of months being in another dorm, and it's made me not sure of what is the truth and what is a lie, what's fabricated.

Michael Capdeboscq, a defense attorney, testified at the motion for new trial hearing for the State. Capdeboscq indicated he had represented Kelvin Rushing. Capdeboscq had met with the prosecutors in the instant matter at least twice. In these meetings, Kelvin was present. According to Capdeboscq, the State did not offer or promise Kelvin anything in exchange for his testimony. Capdeboscq indicated there was no plea deal and that the prosecutors told Kelvin multiple times that they were not offering him anything.

In denying the motion for new trial, the trial court made the following findings:

> Okay. I've looked at, I've looked at all that's been filed. I've also listened to the testimony. You know, everything that's been established—first of all, the deal is real clear that, you know, despite what he may have hoped for, there was no particular deal. The Alvin Davis [testimony] is merely cumulative in nature and the cumulative nature normally does away with new evidence under the new trial, unless it affects the fairness of

the trial. And in my opinion it did not at all.[55]   As to the witness here today, the first witness, he added nothing at all. I don't find any reason at all for granting a new trial on the basis that were filed and; therefore, I'm going to deny the Motion for New Trial.

The trial judge when called upon to assess the legal merits of a motion for a new trial is accorded considerable latitude in evaluating the reliability of evidence and its potential impact on the verdict; his ruling will not be disturbed on appeal in the absence of a clear showing of an abuse of discretion. *State v. Humphrey*, 445 So. 2d 1155, 1159–60 (La. 1984). Based on the foregoing, there is nothing in the record to suggest that Pete Snyder's partial recantation was inappropriately obtained by the State. Further, there is nothing in the record to suggest that Kelvin Rushing testified as he did at trial because of an agreed-upon sentencing deal with the State. Accordingly, we find no reason to disturb the trial court's denial of the defendant's motion for new trial.

This pro se assignment of error is without merit.[56]

The Louisiana Supreme Court subsequently denied relief without additional reasons.     The

---

[55]   Alvis [sic] Davis, Jr., is an Angola inmate, serving a life sentence. He has, according to him, convictions for "burglaries, possession of cocaine residue, ... possession of a crack rental [sic], forcible rape." Davis testified at the motion for new trial hearing that he sent a letter to Jerome Smith, an assistant district attorney in St. Tammany Parish. Jerome Smith confirmed at the hearing that he received a letter from an unknown person in June of 2016 (prior to the defendant's trial). There was no return address on the envelope, and the letter was not signed. In any case, Davis testified at the hearing that he wrote the letter. The letter indicated that the defendant was innocent and that Lisa and Kelvin were responsible for N.B. testing positive for cocaine. The trial court ruled at the hearing Davis's testimony was cumulative because Kelvin had written similar letters from jail to Lisa; that is, letters that suggest the defendant was innocent and Lisa was behind N.B. getting cocaine into her system. Kelvin was extensively questioned at trial on the content of these letters. Kelvin indicated at trial that he felt Lisa was being disloyal, and that he was angry with Lisa because she knew Sergeant Irwin, yet Lisa could not help Kelvin with his charges.

[56]   *State v. Bickham*, 2018 WL 947095 at *13-16 (footnote in original).

claim was also raised and rejected in state post-conviction relief proceedings.[57]

As an initial matter, to the extent Bickham argues that the state trial court erroneously denied his motion for a new trial, the claim does not involve a question of federal or constitutional law; review of purely state-law claims is not proper on federal habeas review. *Haygood v. Quarterman*, 239 F. Appx. 39, 42 (5th Cir. 2007) (citing *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991)) (state court's denial of a motion for a new trial does not necessarily constitute a violation of a federal constitutional right).   A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding," and instead is limited to review of questions of federal constitutional dimensions.   *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (citation and quotation omitted); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law).

He fares no better on his federal claim.   Pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, it is a federal constitution violation for a prosecutor to suppress material evidence favorable to the defense.   To prevail on a *Brady* claim, a petitioner must establish three elements: "(1) the state withheld evidence, (2) the evidence was favorable to the accused, and (3) the evidence is material to guilt or punishment."   *DiLosa v. Cain*, 279 F.3d 259, 262-63 (5th Cir. 2002).   "Evidence is 'material' if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."   *United States v. Davis*,

---

[57]  State Rec., Vol. 11 of 14, PCR Memorandum in Support, Claim Two.

609 F.3d 663, 696 (5th Cir. 2010).

To succeed on a *Brady* claim, a defendant must "show[ ] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."   *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).   "A *Brady* violation is more likely to occur when the impeaching evidence 'would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration.' "   *LaCaze v. Warden La. Corr. Inst. for Women*, 645 F.3d 728, 736 (5th Cir. 2011) (quoting *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010)).   Because the state courts denied relief on the merits, a federal habeas court must consider this claim under the standards of review mandated by the AEDPA.   28 U.S.C. § 2254(d)(1); *DiLosa v. Cain*, 279 F.3d 259, 262 (5th Cir. 2002).

At the hearing on the motion for new trial, Assistant District Attorney Jerome Smith explained how the letter came into his possession.   He received a letter addressed to him, postmarked July 28, 2016, months before Bickham's trial in November 2016.[58]   However, the letter was not signed and there was no return address, and Smith was unfamiliar with Bickham's pending criminal case involving N.B.   He thought it was connected to a different criminal case for defendant Kelvin Rushing, which concluded in February 2016, so he placed the letter in a basket for filing.   Eventually, he determined the significance of the letter and

---

[58]  State Rec., Vol. 8 of 14, Transcript of Hearing on Motion for New Trial, pp. 1801-06.   *See* Davis letter attached to Motion for New Trial as Exhibit 1, State Rec., Vol. 1 of 14, R.pp. 239-41.

the connection to the November 2016 trial and brought it to Macke (who along with Sims prosecuted the case against Bickham), but only after the trial had concluded.    They were able to glean who the letter was from by using context cues.    The prosecutors promptly gave Davis's letter to the defense.    A synopsis of Davis's letter based on evidence adduced at the motion for new trial hearing was set forth by the court on direct appeal as follows:

> Alvis [sic] Davis, Jr., is an Angola inmate, serving a life sentence. He has, according to him, convictions for "burglaries, possession of cocaine residue, ... possession of a crack rental [sic], forcible rape." Davis testified at the motion for new trial hearing that he sent a letter to Jerome Smith, an assistant district attorney in St. Tammany Parish. Jerome Smith confirmed at the hearing that he received a letter from an unknown person in June of 2016 (prior to the defendant's trial). There was no return address on the envelope, and the letter was not signed. In any case, Davis testified at the hearing that he wrote the letter. The letter indicated that the defendant was innocent and that Lisa and Kelvin were responsible for N.B. testing positive for cocaine. The trial court ruled at the hearing Davis's testimony was cumulative because Kelvin had written similar letters from jail to Lisa; that is, letters that suggest the defendant was innocent and Lisa was behind N.B. getting cocaine into her system. Kelvin was extensively questioned at trial on the content of these letters. Kelvin indicated at trial that he felt Lisa was being disloyal, and that he was angry with Lisa because she knew Sergeant Irwin, yet Lisa could not help Kelvin with his charges.[59]

Alvin Davis related what Rushing purportedly told him when they shared a dorm in prison.    The state courts found that the evidence from Alvin Davis was largely cumulative of what Kelvin Rushing had written in letters to Lisa Gauthier and was questioned about at trial, that is, the suggestion it was not Bickham, but Gauthier, who was responsible for N.B. ingesting cocaine.    At the new trial hearing, Davis recounted that Rushing told him he went

---

[59]   *State v. Bickham*, 2018 WL 947095 at *15 n. 8.

to Gauthier's the day of the incident "with powdered cocaine to cook up at [her] house and there's no way possible Mr. Bickham could have gave this baby cocaine because he never had cocaine from the beginning."[60]

Rushing testified at trial and was questioned regarding similar statements he made about Lisa Gauthier being the one responsible for N.B. ingesting cocaine, rather than Bickham.   He admitted he wrote letters to Gauthier suggesting this, but he explained he was angry with Gauthier when he made the statements, and insisted he was testifying truthfully against Bickham because he wanted to do the right thing.[61]   The secondhand iteration from Davis was considerably less significant than Rushing's own testimony at trial regarding who was responsible.   Furthermore, not a single witness, including Rushing, ever saw Gauthier use cocaine, whereas multiple witnesses testified to Bickham using and making cocaine at his residence.   As the state court of appeal reasonably determined, Davis's letter relating hearsay from Rushing was essentially immaterial and cumulative and would not have affected the outcome of the trial because Rushing had already been confronted with his own conflicting statements during trial.   In this case, there is no reasonable probability that had Davis's letter been disclosed to the defense, the result of the proceeding would have been different.

---

[60]   State Rec., Vol. 8 of 14, Hearing on Motion for New Trial, p. 1809.

[61]   State Rec., Vol. 6 of 14, Trial Transcript, pp. 1355-70.

Bickham also argues, based on the newly discovered evidence, that the State suppressed an implied agreement with Rushing for a more lenient sentence if he testified against Bickham.    According to Davis, Rushing spoke to Collin Sims for two hours at the jail and then told Davis that he would not be getting a life sentence if he testified against Bickham.[62]    Snyder qualified what he attested to in his affidavit and explained that while Rushing said he was hoping to get a better deal, he did not tell him he was promised a sentence around ten years if he testified.[63]

First, Bickham concedes Rushing was not offered an "official deal," and the record confirms that.[64]    Rushing himself testified that the State did not promise him leniency in sentencing if he testified against Bickham at trial.    The evidence overwhelmingly shows that no formal deal existed.    As the state appellate court concluded in considering the denial of new trial claim on appeal, "there is nothing in the record to suggest that Kelvin Rushing testified as he did at trial because of an agreed-upon sentencing deal with the State."[65]    The appellate court cited the testimony from Rushing's defense counsel at the motion for new trial hearing that confirmed the State did not offer or promise anything in

---

[62]  *Id*. at 1810-11.

[63]  State Rec., Vol. 8 of 14, Transcript of Motion for New Trial, pp. 1785-1791.

[64]  Rec. Doc. 6-1, p. 35 (C)(ii). *See* State Rec., Vol. 6 of 14, Trial Transcript, pp. 1329-32; 1380-83.

[65]  *State v. Bickham*, 2018 WL 947095 at *15.

exchange for his testimony.     In fact, prosecutors told Rushing multiple times that they were not offering him anything.     Bickham has not established that Rushing had a formal deal or agreement with the State in exchange for his testimony.

Bickham suggests that an unofficial or implied promise for a 10-year sentence existed and "the State failed to correct the false testimony of no deal or hope or belief for leniency for testimony."[66]    He points to the fact that Rushing's sentencing was delayed until after he testified at Bickham's trial, and that Rushing subsequently received an extremely favorable 10-year sentence on his conviction for being a felon in possession of a firearm even though he was facing a possible life sentence as a fourth-felony offender.[67]    In support, Bickham cites Snyder's recanted statements in his affidavit about Rushing telling Snyder before his trial that he had an unofficial 10-year deal with the prosecution for his testimony.    As discussed above, Snyder's affidavit and proposed testimony, among other things, was set forth in the motion for new trial,[68]   which was denied by the trial court and affirmed by the

---

[66]  Rec. Doc. 6-1, p. 35.

[67]  Rushing had at least eight prior felony convictions.     State Rec., Vol. 6 of 14, Trial Transcript, p. 1330.     He disputed one of the prior alleged felony convictions and the prosecutor, Sims, had agreed to consider whether to exclude that felony in any habitual offender sentencing, but that was not part of a deal for his testimony against Bickham. Rushing's criminal defense attorney testified at the hearing on the motion for new trial that Rushing did indicate he hoped to get a better sentence by testifying.     However, he was facing 20 years and a possible life sentence as a fourth-felony offender, and the assistant district attorneys could not have been clearer in saying there was no promise or guarantee of leniency if he testified.     State Rec., Vol. 8 of 14, Transcript of Hearing on Motion for New Trial, pp. 1824-28; *see also* State Rec., Vol. 6 of 14, Trial Transcript, p. 1332.

[68]  State Rec., Vol. 1 of 14, Motion for New Trial (Exhibit 2 - Snyder Affidavit), R.pp.

courts of appeal.

The mere fact that Rushing ultimately received a lenient sentence does not demonstrate the existence of a promise of leniency or a specific agreement to a 10-year sentence. *Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004); *Dowhitt v. Johnson*, 230 F.3d 733, 756 n. 33 (5th Cir. 2000). Rushing himself testified repeatedly he had no agreement for leniency in sentencing with the prosecutors. Absent any evidence that an agreement existed, he cannot establish a *Brady* violation. *Cortez v. Davis*, 665 F. Appx. 330, 334 (5th Cir. 2016) (favorable sentence in plea deal for witness that occurred after he testified for State does not prove pre-existing agreement or *Brady* violation); *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) ("Murphy has failed to establish a *prima facie* claim under *Brady* by virtue of his having failed to demonstrate the existence or concealment of a deal between the prosecution and the witness.... Allegations that are merely 'conclusionary' or are purely speculative cannot support a *Brady* claim."); *Coleman v. Cain*, Civ. Action No. 07-3655, 2014 WL 348541, at *9 (E.D. La. Jan. 31, 2014) (Milazzo, J.) ("Petitioner has failed to establish the existence of a deal between [a witness] and the State, which dooms his *Brady* claim."). Because there was nothing to disclose, the state courts reasonably determined that Bickham failed to demonstrate a *Brady* violation.

Additionally, the state court reasonably concluded that Snyder's testimony was not beneficial because he expressly recanted a significant portion of his affidavit prepared by

---

242-43.

defense counsel.   Snyder contacted defense counsel directly after trial had concluded and defense counsel, Brian Dragon, met with him in jail and had him sign an affidavit.   By the time of trial, he expressed serious misgivings about giving the testimony because he was unsure now what was true.   He admitted that he was no longer "sure of what is the truth and what is a lie, what's fabricated." [69]   Like Davis's secondhand iteration, Snyder's confused recall of his jail conversation with Rushing is considerably less significant than Rushing's own trial testimony.   Given Snyder's recanted sworn statements about Rushing having a deal with the prosecutor in exchange for his testimony, which was flatly contradicted in any event by Rushing's own testimony and the testimony of Rushing's criminal defense attorney Michael Capdeboscq (a witness at the hearing on the motion for new trial), and Snyder's admitted misguided recollection in general, the denial of a new trial based on the omitted testimony did not render the criminal proceedings fundamentally unfair.

Finally, Bickham claims that the State suppressed the identity of an investigator for the Department of Children and Family Services (DCFS).   He argues that "a material witness, Ms. Kelsey Bourgeois, was unavailable to attend trial and the State informed defense counsel about a week before trial of said unavailability to attend trial due to a serious medical

---

[69]   State Rec., Vol. 8 of 14, Transcript of Hearing on Motion for New Trial, pp. 1790-1791.

reason."[70]   This omission allegedly resulted in the defense being unable to impeach the testimony of Gauthier and her daughter by calling a different witness, Stacey Williams, who also investigated the case, but was not mentioned in any DCFS report.

The record shows that the prosecution disclosed the DCFS investigative files to the defense before trial.   The State filed a notice of its intention to introduce statements made to DCFS staff (Ashley Farmer and Charlotte Duncan) as per "copy of DCFS file provided in discovery."[71]   Despite the State issuing a trial subpoena for investigator Kelsey Bourgeois, she was unable to testify at trial.   The State called Charlotte Duncan and the defense called Ashley Farmer, both foster care workers for DCFS.

The record confirms that the State produced the relevant DCFS investigation files during discovery.   Bickham does not contest this.   He also admits the defense knew about the witness' unavailability well before trial started.   The State had no obligation to comb through materials or conduct a search on behalf of the defense for names of every investigator who might have been involved in the case.   "*Brady* and its progeny permit the government to make information within its control available for inspection by the defense and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed."   *United States v. Pelullo*, 399 F.3d 197, 212 (3rd Cir. 2005) (citations omitted); *see also Johnston v.*

---

[70]   Rec. Doc. 6-1, p. 30; *see also* Motion for New Trial, State Rec., Vol. 1 of 14, p. 236.

[71]   State Rec., Vol. 1 of 14, p. 187.

*Pittman*, 731 F.2d 1231, 1234 (5th Cir. 1984) ("*Brady*, however, does not extend due process to the point of requiring the state to pursue every possible avenue of investigation and make the defendant's case for him."). Nor, as the State mentions, has Bickham offered anything besides speculative self-serving allegations to establish that Williams, as a substitute for Bourgeois, a planned witness for the State, had favorable defense testimony to offer, such as additional impeachment evidence concerning conflicts in the testimony of Gauthier and her daughter beyond that brought out on cross-examination of these witnesses themselves at trial. Thus, Bickham cannot establish that the State withheld the identity of a DCFS witness. For the reasons addressed, Bickham's claim concerning the denial of the motion for new trial based on newly discovered evidence does not warrant habeas relief.

*Claim Three*: *Prosecutorial misconduct*

Bickham claims that the prosecution suppressed material evidence and allowed Kelvin Rushing to give patently false testimony about the existence of a deal for more lenient sentencing on his recent criminal conviction in exchange for his testimony at trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972). The *Brady* claim was addressed above as part of his second claim for relief. He also argues that the State coerced the false testimony of Ashley Mason, Kayla Gregg and Marshae Navarre.

Due process imposes a duty upon the prosecutor to correct false or misleading evidence that is harmful to the defendant. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173,

3 L.Ed.2d 1217 (1959).    The rule applies to both the solicitation of false testimony and the knowing acquiescence in false testimony.    *Id.*    Under *Napue*, a defendant must show that (1) the testimony in question was actually false; (2) the prosecutor knew it was false; and (3) the testimony was material.    *Duncan v. Cockrell*, 70 F. Appx. 741, 744 (5th Cir. 2003). "Deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.' "    *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

Rushing candidly testified at trial that he hoped for leniency in sentencing if he testified. [72]    However, that hope did not stem from an offer or arrangement made by prosecutors.    Rushing admitted he reached out to many different people because he wanted some type of leniency consideration.    He sent letters to prosecutors, J. Collin Sims and William Macke, asking for leniency and compassion.[73]    He also reached out to Detective Knight and Lisa Gauthier for help with his pending criminal charges.    He explained that he solicited help from Detective Knight, who then sent a letter to the district attorney's office requesting leniency on Rushing's behalf.[74]    However, Detective Knight had no control over the prosecutors and Rushing was never promised any leniency in sentencing by the State.

---

[72] *See State v. Bickham*, 2018 WL 947095 at *7 (quoting excerpts from Rushing's trial testimony refuting Bickham's claim that Rushing lied to curry favor with the State).

[73] State Rec., Vol. 6 of 14, Trial Transcript, pp. 1371-75.

[74] State Rec., Vol. 6 of 14, Trial Transcript, pp. 1377-78 (Rushing); State Rec., Vol. 4 of 14, Trial Transcript, pp. 858-60, 874-75 (Detective Knight).

Rushing admitted he tried to get Gauthier to help him with a deal through Detective Irwin. That did not happen.    Rushing emphatically denied that he was ever offered a beneficial sentencing deal or promised leniency in exchange for his testimony.    Because there was no deal or promise of leniency, there was no false testimony by Rushing to correct.    Bickham is not entitled to relief on this claim.

Bickham also asserts that the State either coached witnesses "to plead the 5th... or they received state leniency to reduce penalties in their own separate criminal case."[75]    He claims prosecutorial misconduct resulted when the prosecution elicited false and coerced testimony from State witnesses.

He alleges that the prosecutor "coached Mason to plead the 5th with her fearing prosecution if she did not testify to please the D.A."[76]    The record indicates just the opposite.    The State applied for and obtained a material witness warrant to compel Mason's testimony.[77]    When Mason appeared in court in September 2016, the trial court explained the right against self-incrimination and the Fifth Amendment privilege.    Mason immediately said she wanted to plead the Fifth Amendment.[78]    The trial court explained she would be allowed to discuss the matter with an appointed attorney.    Mason appeared

---

[75]  Rec. Doc. 6-1, p. 31.

[76]  Rec. Doc. 6-1, p. 36.

[77]  State Rec., Vol. 1 of 14, p. 126-27.

[78]  State Rec. Vol. 2 of 14, Transcript of Hearing (September 20, 2016), pp. 334-36.

with counsel for the hearing on the material witness warrant set the following day.[79]    The prosecutor noted for the record that Mason intends to invoke her Fifth Amendment privilege and does not wish to testify at this time, and she was issued a subpoena for the trial date. Mason was present with her attorney for the November 2016 trial.    The State obtained an order to compel her testimony with a qualified immunity agreement that any information directly or indirectly derived from such testimony at trial shall not be used against her in any criminal case except a prosecution for perjury, giving a false statement or otherwise failing to comply with the order.[80]    Mason's counsel informed the trial court that she had explained to Mason the State's motion to compel her testimony and the offer of immunity, and the trial court confirmed on the record that Mason understood what it entailed.

The Fifth Amendment right "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."    *Kastigar v. United States*, 406 U.S. 441, 444–45 (1972) (footnote omitted).    As a witness for the State, Mason would be describing her interactions with Bickham, and that required her to admit to possessing and using crack cocaine.    As a result, she invoked her Fifth Amendment privilege.    To compel

---

[79]  State Rec., Vol. 2 of 14, Transcript of Hearing (September 21, 2016), pp. 350-53.

[80]  State Rec., Vol. 1 of 14, pp. 205-08; State Rec., Vol. 6 of 14, Trial Transcript, p. 1267-69.

her testimony, the State agreed to grant her qualified immunity as previously stated.    The jury was made aware of this.    At the end of direct examination, the prosecution asked about her unwillingness to testify.    She admitted she had a drug problem, and she did not want to testify.    She was pleading the Fifth because she did not want to incriminate herself, and the State was forced to give her qualified immunity.    She testified that the State gave her no consideration in any pending criminal case in exchange for her testimony.[81]

It is clear Mason chose independently to invoke the Fifth Amendment because she feared self-incrimination for her admitted use of crack cocaine, thereby forcing the State to grant her qualified immunity.    She was otherwise an unwilling witness for the State.    The record certainly does not indicate that Mason was willing to testify at any point during the criminal proceedings, and certainly not as a defense witness, to suggest that the State coerced a formerly willing witness for the defense into invoking her Fifth Amendment privilege.    *See*, *e.g.*, *Webb v. Texas*, 409 U.S. 95, 97-98 (1972) (a defendant's right to due process may be violated if a defense witness who is otherwise willing to testify is coerced into invoking his or her Fifth Amendment privilege against self-incrimination).    Here, Bickham implies that the State coerced Mason to lie for the prosecution by granting her immunity or privilege from other pending criminal proceedings; however, the record refutes this.    The jury knew Mason was given no such consideration by the State.    Mason was warned by the trial court that her testimony would not be used against her in any criminal

---

[81]  State Rec., Vol. 6 of 14, Trial Transcript, pp. 1312-13.

case *except* perjury or giving a false statement.      Thus, false testimony would still result in a perjury charge.      There is simply no evidence tha the State coached Mason to plead the Fifth Amendment, induced Mason to lie, or knowingly presented untrue testimony.

The same is true of Kayla Gregg, who also tried to invoke the Fifth Amendment earlier in the proceedings and was compelled by the State to testify at trial.[82]      At trial, with her counsel present, she admitted that she did not want to testify, and the State had to grant her qualified immunity for her testimony.      The trial court explained to the jury what qualified immunity entailed.      Gregg testified that she was arrested for second degree cruelty to a juvenile arising out of this case, and she pleaded guilty to child desertion.      She testified on direct examination, and reiterated on cross-examination, that she was not offered a plea deal or anything else from the State in exchange for her testimony.[83]      In fact, on cross-examination, defense counsel explored the beneficial outcomes she received in her other criminal cases,[84]  and she denied being offered anything from the State in exchange for her testimony.      The State did not coach Gregg to plead the Fifth Amendment, induce Gregg to lie, or knowingly present untrue testimony.

---

[82]  State Rec., Vol. 5 of 14, Trial Transcript, pp. 1226-29.

[83]  *Id*. at 1226-29; 1234-35.

[84]  Gregg admitted she received 90 days for child desertion of N.B.; she received 10 years, which she was currently serving, for pleading guilty in June 2016 to burglary and the State agreed not to multiple bill her and to let her go into a re-entry program which meant she might be out in 2018 for her 10-year sentence.      State Rec., Vol. 5 of 14, Trial Transcript, p. 1234.

Bickham offers nothing to show how Marshae Navarre was coerced by the State to testify against him.[85]   He simply notes that she has a series of felony convictions, pending charges and that Rushing was her ex-boyfriend, all of which the prosecution elicited on direct examination.   Navarre expressly denied that the State offered her anything in exchange for her testimony. [86]   Bickham does not dispute this.   Consequently, for the reasons expressed, Bickham has not shown that he is entitled to relief on his prosecutorial misconduct claim.

*Claim Four*: *Defense Work-Product Files*

Bickham claims that his trial was rendered fundamentally unfair when the prosecution acquired defense counsel's case files, which included his work product, and used the files to its advantage.   This claim was considered and rejected on direct appeal.   In denying the claim, the Louisiana First Circuit reasoned:

> In his second counseled assignment of error, the defendant argues the trial court failed to grant his motion for new trial.[87]  Specifically, the defendant contends that the State's receipt and alleged use of defense counsel's files violated his right to a fair and impartial trial.
>
> On the first day of trial, just after voir dire had been concluded and before the first witness had been called, defense counsel, Brian A. Dragon, informed the trial court that it had just come to his attention that a copy of his file (a flash drive), which he had provided to the defendant, wound up in the District

---

[85]   Rec. Doc. 6-1, p. 38.

[86]   State Rec., Vol. 6 of 14, Trial Transcript, pp. 1393-95.

[87]   It does not appear from the record that the defendant moved for a new trial regarding this issue; nor did he move for a mistrial.

Attorney's Office. One of the prosecutors, J. Collin Sims, explained to the trial court that the defendant had given Dragon's file to the Concerned Citizens of St. Tammany Parish, who turned it over to the Slidell Police Department, who turned it over to the D.A.'s Office. Sims informed the trial court that a "filter team" at the D.A.'s Office was looking through the file at that time. Dragon stated that a lot of information in that file were his notes on the case and his work-product.

While Sims argued that Dragon's file was properly in a review process, the prosecution team (Sims and William Macke) had not been privy to any of the materials in the file. Sims made clear that neither he nor Macke had reviewed the file, nor were they going to review it. Sims explained that he had no idea what was on the file and that they had just gotten it that morning. The trial court imposed an order, to take effect immediately, that the D.A.'s Office stop looking at Dragon's file. The order was imposed, and the review process was stopped.

While Dragon noted that the disclosure of his personal information had been inadvertent, the trial court pointed out that the defendant "wanted to give everything to the press for the press to—or not to the press, to this community group so he intended for something to be hashed out outside of the judicial process, didn't he?" In any event, the D.A.'s office stopped looking at Dragon's file, and the prosecution turned over any copy of the file they had to the trial court. The trial court then proposed, and Dragon agreed, that someone from the trial court's office (Ms. Draper) would look at Dragon's file and determine what was and was not work product. At the same time Ms. Draper reviewed the file, Dragon would review the file with her and verify his work product. If Ms. Draper and Dragon disagreed on anything, the trial court would then review it and make a determination.

Following a recess, the trial court informed the parties that upon its review, it had deleted those items, such as opening statements, notes, and questions. Four things were unable to be accessed and, as such, the trial court continued the order (of no review) until someone had means to access those files.

Based on the foregoing, the defendant has failed to show how he was prejudiced in any way. Neither Sims nor Macke saw any of the information that was on Dragon's file, including any of his work-product.

This counseled assignment of error is without merit.[88]

The Louisiana Supreme Court denied relief without additional stated reasons.

On the second morning of trial, defense counsel brought to the trial court's attention that the prosecution was in possession of case files containing his work product. The disclosure occurred when Bickham asked defense counsel's office for a copy of his case file. The file he was given included not only the audiotapes made by Lisa Gauthier containing her recorded conversations with Detective Irwin, but also defense counsel's work product. Bickham wanted to report, and perhaps publicize, the highly inappropriate relationship between an investigating lead detective in his case and a key witness; however, he did not realize the extent of the other defense case materials on the file copy he was provided by defense counsel. He gave the file (a flash drive copy) to the Concerned Citizens of St. Tammany Parish, and that flash drive was passed along to different entities, finally landing in the hands of the St. Tammany Parish District Attorney's Office that morning.

Prosecutors, Sims and Macke, informed the trial court that their office would review the file through a separate filter team and the prosecution team was not privy to the materials during that review phase. Defense counsel objected because the flash drive contained his work product which was off-limits and not subject to review by the prosecution under any circumstances. Defense counsel requested the return of all flash-drive copies. The prosecution disagreed essentially because a filter team was in place and

---

[88]  *State v. Bickham*, 2018 WL 947095 at *8-9 (footnote in original).

neither Sims nor Macke was privy to the materials.    The trial court ordered the prosecution, including the filter team, to stop reviewing the materials until the trial court made a final ruling on the matter.    The trial court was unimpressed with the filter team process and commented that it sounds like a "pretty serious breach" for the prosecution to get work product materials and start using them.[89]

After opening statements, the trial court took up the matter again.[90]    The State and the defense presented various arguments to support their positions under state law.    The trial court suggested that a representative from the court look through everything on the flash drive and determine with defense counsel if it is work product.    Defense counsel agreed stating, "I'll be perfectly fine with that," and suggesting that if a work product item is identified, the item could be deleted and whatever remained on the flash drive could be given to the State.[91]    The trial court would review any gray areas in which defense counsel disagreed with the staff member about the nature of the item.

After lunch recess, the trial court ruled that the court had deleted the items such as opening statements, notes, questions by defense counsel and that there were only four files they could not access; the court continued the order as to those items.    Defense counsel stated that the four blocked files were work product.    The trial court accommodated

---

[89]   State Rec., Vol. 3 of 14, Trial Transcript, pp. 669-76.

[90]   *Id*. at 724.

[91]   *Id*. at 737.

defense counsel's request and ordered the State to return its copy of the flash drive to the court.    The trial court provided the prosecution with the reviewed court copy of the flash drive that contained only the "court-approved materials" and the four blocked items created with a program the court was unable to access, which were subject to the court's continued order that the prosecution refrain from reviewing those items until the court instructed otherwise.[92]    No objections or motions were made at this point.

Bickham claims that "[m]ost certainly, it can be presumed the D.A. used the defense counsel's work product (case files) to his advantage in prosecution; the presumption can be reasonably assessed where the D.A. already violated the legal requirement to turn the material over immediately---and did not (rather, defense counsel discovered the acquisition and review thereof himself)."[93]    To the extent Bickham refers to a state evidentiary rule and disputes the trial court's ruling applying state law, the issue is not reviewable in this federal habeas proceeding.    Again, a federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding," and instead is limited to review of questions of federal constitutional dimensions.    *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (citation and quotation omitted); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (federal habeas review does not lie for errors of state law).

To the extent he suggests the ruling denied him due process and a fundamentally fair

---

[92]    *Id*. at pp. 740-44.

[93]    Rec. Doc. 6-1, p. 41.

trial, he fares no better.     The record shows that the trial court restricted the prosecution's access to the defense's work product and prevented the State's review of those materials. The prosecuting attorneys had not reviewed the files on the flash drive and an immediate order was entered restricting any further access by the prosecutors or their filter team at the District Attorney's office.     Court staff reviewed the files with defense counsel, subject to further review by the trial judge, and the files containing objectionable work product were deleted from the flash drive.     The state courts reasonably determined that the prosecutors did not see or use any of the defense's work product materials.     Bickham has not demonstrated otherwise.     The record refutes his speculative presumption that the prosecution must have used the defense work product to its advantage.     The claim is unsupported.     No objection was ever raised by the defense at trial to the remaining materials on the flash drive.     Bickham is not entitled to federal habeas corpus relief.

## **RECOMMENDATION**

For the foregoing reasons, it is **RECOMMENDED** that Bickham's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[94]

New Orleans, Louisiana, this ___16th___ day of ___September___, 2022.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[94]  *Douglass* referenced the previously applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to 14 days.